J-S27012-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 724 MDA 2023 |

Appeal from the Order Entered April 17, 2023
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000115-2023

BEFORE:  BENDER, P.J.E., BOWES, J., and SULLIVAN, J.

MEMORANDUM BY BENDER, P.J.E.:              **FILED OCTOBER 24, 2023**

A.F. ("Mother") appeals from the April 17, 2023 order finding her to be a perpetrator of child abuse against her minor child, B.G. (born in October of 2022), pursuant to 23 Pa.C.S. § 6303, and adjudicating B.G. dependent. Mother solely challenges the finding of child abuse against her.  After careful review, we affirm.[1]

The trial court provided a detailed recitation of the facts and procedural history of this matter, which we need not reproduce herein.  *See* Trial Court Opinion ("TCO"), 5/19/23, at 1-6.  Briefly, this case stems from a domestic dispute that occurred on December 27, 2022, during which Mother allegedly stabbed Father multiple times while he was holding B.G. on his chest.  *See* TCO at 1, 3, 5.  Mother was arrested and charged with numerous crimes,

_____

[1] M.G. ("Father") is not a party to this appeal.

including child endangerment. *Id.* at 5. She was released on bail with conditions that restricted her contact with B.G. Because of the incident, the York County Office of Children, Youth and Families ("CYF") received a Child Protective Services referral for B.G., due to concerns for her safety. *Id.* at 1. A few months later, after learning that Father and B.G. were evicted from a hotel where they had been living, CYF filed a petition for emergency protective custody, which was granted by the trial court. *Id.* at 2. On April 12, 2023, CYF petitioned the trial court to adjudicate B.G. dependent, to find that B.G. was a victim of child abuse, and to find that Mother perpetrated said abuse. *Id.*

A hearing was held on April 17, 2023, during which the court heard testimony from the officer who responded to the 911 call on December 27, 2022, and the CYF caseworker assigned to the case. *Id.* The court took judicial notice of Mother's criminal charges and accepted the officer's report into evidence. Neither Mother nor Father offered any evidence or testimony. *Id.* Based on the evidence presented at the hearing, the court adjudicated B.G. dependent and found that Mother was a perpetrator of child abuse against B.G. *Id.*

Mother filed a timely notice of appeal, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court filed a responsive opinion on May 19, 2023. Herein, Mother presents a single issue for our review: "Whether or not the lower court erred when it

entered a finding of abuse against [Mother] without clear and convincing evidence." Mother's Brief at 4 (unnecessary capitalization omitted).[2]

Preliminarily, we note:

The standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*Interest of A.C.*, 237 A.3d 553, 557 (Pa. Super. 2020) (citations omitted).

"The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

It is also well-established that:

While dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301-6375, the Child Protective Services Law ("CPSL") controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence. *See In the Interest of J.R.W.*, … 631 A.2d 1019 (Pa. Super. 1993). As the Supreme Court explained in *In the Interest of L.Z.*, [111 A.3d 1164, 1176 (Pa. 2015)], "[as] part of [a] dependency adjudication, a court may find a parent to be the perpetrator of child abuse," as defined by the CPSL.

*Interest of T.G.*, 208 A.3d 487, 490 (Pa. Super. 2019).

The CPSL defines "child abuse," in relevant part, as follows:

---

[2] Mother's concise statement filed in compliance with Pa.R.A.P. 1925(a)(2)(i) contained the same single issue. *See* Concise Statement, 5/16/23, at 1 ¶ 3 ("It is alleged that the lower court erred when it entered a finding of abuse against [Mother] without clear and convincing evidence.").

> **(b.1) Child abuse**.—The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> …
>
> (3) Causing or substantially contributing to serious mental injury to a child through any act or failure to act or series of such acts or failures to act.
>
> …
>
> (5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.

23 Pa.C.S. § 6303(b.1)(3), (5).

Mother essentially argues that the trial court entered a finding of abuse against her without clear and convincing evidence. Mother's Brief at 12. She argues that there were no witnesses to corroborate Father's claim that he was holding B.G. when she allegedly stabbed him, and that B.G. bore no obvious signs of injury or of even being in close proximity to Father during the alleged stabbing. *Id.* Additionally, Mother questions the trial court's finding Father's version of events credible, arguing that Father initially made false statements to the police and that there is no evidence to support the statement he made a week after the incident. *Id.* at 16.[3]

_____

[3] To the extent that Mother argues CYF was not required to pursue a finding of abuse against her at the adjudication hearing since she was incarcerated at the time pending resolution of her criminal charges, and that the court's finding of abuse against her only served to prejudice her, *see* Mother's Brief at 19-20, we deem these issues waived for failure to include them in her Rule 1925(a)(2)(i) concise statement and her statement of questions involved. *See* Pa.R.A.P. 2116(a) ("The statement of questions involved must state concisely the issues to be resolved…. No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."); Pa.R.A.P. 1925(b)(4)(ii) ("The Statement shall concisely identify
*(Footnote Continued Next Page)*

In reviewing Mother's arguments, we have considered the briefs of the parties, the certified record, and the applicable law. We have also assessed the detailed and well-reasoned opinion of the Honorable Joseph N. Gothie of the Court of Common Pleas of York County. Judge Gothie's opinion thoroughly explains the basis for his finding "by clear and convincing evidence that [Mother] was a perpetrator of child abuse." TCO at 7. He provides a detailed discussion of the evidence presented at the hearing, as well as an explanation of his credibility determinations. Mindful of the evidentiary standard, Judge Gothie found it "both clear and convincing that [Mother] stabbed [Father] while he was holding [B.G.] on his chest[;]" thus, he concluded that Mother "came dangerously close to stabbing [B.G.] … and created a reasonable likelihood of bodily injury." *Id.* at 9. Nevertheless, Judge Gothie conducted an alternative analysis, giving credence to Mother's theory that Father was not holding B.G. when he was stabbed. He explained that even if Father had removed B.G. from his chest before he was stabbed, "the court fully believes that [B.G.] was … within the bedroom, possibly on the bed, as [Mother] stabbed [Father]." *Id.* at 11. As such, Judge Gothie concluded that a finding of abuse would still be proper, because regardless of where B.G. was in the

---

each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge."); Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); *In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) ("[I]t is well-settled that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived.").

room, there was still a substantial and unjustifiable risk of injury to B.G. **_Id._**

The record confirms that Judge Gothie's decision is supported by ample, competent evidence. Accordingly, we adopt his opinion as our own, and we affirm the order finding Mother to be a perpetrator of child abuse against B.G.

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/24/2023

**IN THE COURT OF COMMON PLEAS OF YORK COUNTY,
PENNSYLVANIA**

**JUVENILE DIVISION**

| | |
|---|---|
| **In the Interest of: B.G., a minor** | **NO: CP-67-DP-115-2023** |

## OPINION OF THE COURT PURSUANT TO PA.R.A.P. 1925(a)

PROCEEDURAL BACKGROUND

This case involves the dependency of B.G., an infant child, and stems from a domestic dispute that occurred in the early morning of December 27, 2022. B.G. was just shy of being three months old at the time of the dispute. Because of the incident, the York County Office of Children, Youth and Families ("YCOCYF") received a Child Protective Services referral for B.G. due to concerns for her safety.

1

B.G. and her father **M. G.** ~~Marcus Grant~~ were evicted from the hotel they were living at on March 27, 2023. Following news of the eviction, YCOCYF filed a petition for emergency protective custody on March 29, 2023. The undersigned judge granted the petition on the same day. On April 12, 2023, YCOCYF petitioned this court to adjudicate B.G. dependent, to find that B.G. was a victim of child abuse, and to find that B.G.'s mother, **A.F.** ~~Alexus Fountain~~, perpetrated said abuse.

A hearing was held on April 17, 2023, during which the court heard testimony from Patrolman Jonathan Hehnly, the West York Borough Police Officer who responded to the 911 call on December 27, 2022, and Tess Shortt, the YCOCYF caseworker assigned to the case. At the hearing the court took judicial notice of **A.F.'S** ~~Alexus Fountain's~~ criminal charges and accepted Patrolman Hehnly's police report into evidence. Neither **M.G.** ~~Mr. Grant~~ nor **A.F.** ~~Ms. Fountain~~ offered any evidence or testimony.[1]

Based on the evidence presented at the hearing, the court adjudicated B.G. dependent. The court also found that B.G. was a victim of child abuse and that ~~Ms.~~ **A.F.** ~~Fountain~~ was the perpetrator.

On May 16, 2023, **A.F.** ~~Ms. Fountain~~ filed an appeal challenging the finding of abuse against her. She claims that the court entered its finding without clear and convincing evidence. Pursuant to Pa.R.A.P. 1925(a), the court issues this opinion in support of its ruling.

---

[1] At the time of the hearing **A.F.** ~~Ms. Fountain~~ had charges filed against her stemming from the incident so it was not in her legal interest to offer testimony.

2

## FACTUAL BACKGROUND

At approximately 3:30 a.m. on December 27, 2022, 911 received a call requesting emergency medical services to 1324 W. King Street in York, PA. West York Borough Police Dep't Incident Report at p. 3. The caller then cancelled the request. Hearing Transcript at p. 14 lines 8–9. 911 received another call a few minutes later and emergency services were dispatched. *Id.* at lines 9–10. EMS was already at the scene bringing ~~Marcus Grant~~ [M.G.] downstairs from the second floor when Patrolman Hehnly arrived. *Id.* at lines 12–14. ~~Mr. Grant~~ [M.G.] had a deep cut in his forearm and blood was soaking through the thighs of his pants. *Id.* at lines 18–19. Police spoke briefly with ~~Mr. Grant~~ [M.G.] before he was taken to the hospital. ~~Mr. Grant~~ [M.G.] advised them that he did not want to be classified as a victim. *Id.* at lines 19–20.

After ~~Mr. Grant~~ [M.G.] departed, Patrolman Hehnly spoke with ~~Alexus Fountain~~ [A.F.]. ~~Ms. Fountain~~ [A.F.] was holding B.G. at the time and her hands were covered in blood. *Id.* at lines 23–24. ~~Ms. Fountain~~ [A.F.] gave the officer a fake name and date of birth. *Id.* at p. 19 lines 2–3. ~~Ms. Fountain~~ [A.F.] also told the officer that ~~Mr. Grant~~ [M.G.] was on the corner of King Street and Hartley Street when he was stabbed. *Id.* at p. 15 lines 18–19. ~~Ms. Fountain~~ [A.F.] was on the phone with ~~Mr. Grant~~ [M.G.] while she was speaking to Patrolman Hehnly. West York Borough Police Dep't Incident Report at p. 3. They both communicated to the officer that they did not want the police to investigate. *Id.* ~~Mr. Grant~~ [M.G.] would later tell the officer at the hospital that he was stabbed in York City on W. Princess Street. West York Borough Police Dep't Incident Report at p. 4.

3

After speaking with **A.F.** ~~Ms. Fountain~~ at the scene, police proceeded upstairs and located the bedroom where EMS had found **M.G.** ~~Marcus~~. Patrolman Hehnly found that there was a large amount of blood on the bedroom's floor. Hearing Transcript at p. 14 line 25–p. 15 line 1. There was specifically a large amount of blood on the bed. *Id.* at p. 15 lines 1–2. A bloody knife was in plain view within the room. *Id.* at lines 5–6. There was also a bloody towel on the floor and blood in the bathroom. *Id.* at lines 3–4.

Also in the home was **R.G.** ~~Richard Grant~~, **M.G.** ~~Mr. Grant's~~ older brother. **R.G.** ~~Richard~~ told officers that both **M.G.** ~~Mr. Grant~~ and **A.F.** ~~Ms. Fountain~~ had been at home and that nobody had entered or left the house. West York Borough Police Dep't Incident Report at p. 3. He also told officers that he had heard **M.G.** ~~Mr. Grant~~ and **A.F.** ~~Ms. Fountain~~ arguing and fighting. Hearing Transcript at p. 16, lines 4–5.

Upon canvassing the home, police noted that the blood was localized to the upstairs of the home in the bedroom and bathroom. *Id.* at lines 10–13, p. 28 line 24–p. 29 line 2. There was no blood on the pavement outside, on the first floor, or on the stairs leading up to the second floor. *Id.* at lines 14–20. Police also canvassed both areas in York City where **M.G.** ~~Mr. Grant~~ and **A.F.** ~~Ms. Fountain~~ claimed the stabbing occurred and found no blood at either location. *Id.* at p. 15, lines 22–24, West York Borough Police Dep't Incident Report at p. 4. Police ultimately concluded that the stabbing occurred within the residence. Hearing Transcript at p. 28 lines 18–19.

On January 4, 2023, about one week after the incident, **M.G.** ~~Mr. Grant~~ spoke with Patrolman Hehnly and gave a written and signed statement. West York Borough

4

Police Dep't Incident Report at p. 4. M.G. [Mr. Grant] claimed that on the night of the incident A.F. [Ms. Fountain] drove to the home intoxicated with B.G. *Id.* at p. 5. Upon her arrival, the two started arguing in A.F.'s [Ms. Fountain's] room and with B.G. present. *Id.* A.F. [Ms. Fountain] then began to strike M.G. [Mr. Grant] with a bottle. *Id.* M.G. [Mr. Grant] took B.G. and went to his room. *Id.* A.F. [Ms. Fountain] eventually came into his room with a knife and stabbed him. *Id.* M.G. [Mr. Grant] was lying on the bed and was holding B.G. at when he was stabbed. *Id.*, Hearing Transcript at p. 17 lines 16–17. M.G. [Mr. Grant] stated that A.F. [Ms. Fountain] threatened him that he would never get to see B.G. again if he told police what happened. West York Borough Police Dep't Incident Report at p. 5, Hearing Transcript at p. 15, lines 2–3.

Based on M.G.'s [Mr. Grant's] statement and the evidence at the scene, A.F. [Ms. Fountain] was arrested and charged with false identification to a law enforcement officer, aggravated assault – attempts SBI or causes injury with extreme indifference, aggravated assault – attempts to cause or causes BI with deadly weapon, intimidation of a witness, and child endangerment. She was released on bail with conditions that prohibited her from contacting M.G. [Mr. Grant] and restricting her contact with B.G. to supervised visits. Hearing Transcript at p. 51, lines 14–15.

Following YCOCYF's involvement, M.G. [Mr. Grant] and A.F. [Ms. Fountain] were interviewed by the agency. M.G. [Mr. Grant] told the agency the same story he told Patrolman Hehnly. He stated that A.F. [Ms. Fountain] was driving drunk with B.G. in the car. *Id.* at p. 31 lines 10–11. He stated that A.F. [Ms. Fountain] came to the house and struck him over the head with a liquor bottle before stabbing him. *Id.* at lines 12–13. [Mr.]

5

**M.G.**
██████ also said that he was lying down with B.G. on his chest when he was stabbed. *Id.* at lines 21–22.

**A.F.**
When interviewed by YCOCYF, ██████████ did not admit to stabbing ██ **M.G.** ██████ *Id.* at p. 32 line 3. However, she admitted to being home with ████████ **M.G.** that morning. *Id.* at lines 7–10. **A.F.** ██████████ also told the agency that B.G. was in a car seat. *Id.* at lines 5–6.

## DISCUSSION

A court may only issue a finding of child abuse when there is clear and convincing evidence to support the decision. 42 Pa.C.S. 6341, *see also In the Interest of N.B.-A.*, 657 Pa. 137, 149 (2020). In making its determination, the court utilizes the definitions of the Child Protection Services Law ("CPSL"). *See In the Interest of N.B.-A.*, 657 Pa. 137, 149 (2020), *In the Interest of L.Z.*, 631 Pa. 343, 361 (2015).

The CPSL defines a perpetrator as a person who has committed child abuse as defined in the CPSL.[2] 23 Pa.C.S. § 6303(a). Child abuse is defined, in pertinent part, as intentionally, knowingly, or recklessly:

> (3) Causing or substantially contributing to serious mental injury to a child through any act or failure to act or series of such acts or failures to act.
>
> …

---

[2] Under the CPSL the definition of "perpetrator" only applies to certain individuals who commit child abuse. A child's parent is specifically included within the definition. *See* 23 Pa.C.S. § 6303.

(5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.

23 Pa.C.S. § 6303(b.1).

An act is recent if it is committed within two years of the date of the report to the county agency. 23 Pa.C.S. § 6303.

With regards to culpability:

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

(3) A person acts recklessly with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and intent of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302.

With the evidentiary standard and definitions in mind the court finds by clear and convincing evidence that A.F. ▓▓▓▓▓ was a perpetrator of child abuse. The court heard credible testimony as to the events that occurred on December 27, 2022. All the evidence that was presented to the court shows that a violent event occurred in the parents' home that night and that A.F. ▓▓▓▓▓ stabbed M.G. ▓▓▓▓ The police

7

found that the only blood in the home was localized within the bedroom and attached bathroom. The bed itself was saturated in blood. There was a bloody knife mere feet away from the pools of blood.

Despite the pools of blood within the bedroom, **M.G.** Mr. Grant and **A.F.** Ms. Fountain denied that the stabbing occurred within the home. They both claimed the stabbing occurred somewhere within York City but provided differing locations as to where it occurred. Nevertheless, police searched the purported crime scenes and found no evidence of a stabbing. Nor could police find any blood outside the parents' residence or in the home leading upstairs to the bedroom that contained pools of **M.G.'s** Grant's blood. Upon interviewing another individual within the residence, police learned that both **M.G.** Mr. Grant and **A.F.** Ms. Fountain were inside the home the entire night and had been arguing. All this, coupled with **M.G.'s** Mr. Grant's statements about not wishing to be a victim, makes it clear that not only did an act of violence occur within the home, but that both parties initially desired to cover up what occurred.

The court also heard credible testimony from Patrolman Hehnly that, approximately a week after the stabbing occurred, **M.G.** Mr. Grant approached police to tell them what exactly happened. **M.G.** Mr. Grant provided the police with a written and signed statement explaining the incident in detail. It was credibly stated that, in **M.G.'s** Grant's own words, he was on the bed with B.G. sitting on his chest when he was stabbed. Furthermore, Patrolman Hehnly testified credibly that **M.G.** Mr. Grant told him that he initially lied to police because **A.F.** Ms. Fountain used B.G. as a tool to prevent **M.G.** Mr. Grant from telling the police what actually happened.

8

Ms. Shortt testified that M.G. gave her a similar, if not identical account of the incident. She testified that M.G. told her that they got into an argument and that A.F. struck him over the head with a liquor bottle. M.G. told her that A.F. then proceeded to stab him as he was lying down with B.G. on his chest.

M.G.'s statements to these witnesses are all but uncontroverted. The only evidence to the contrary was A.F.'s statement to YCOCYF saying that B.G. was in a car seat that night. Her statement is contradicted by Patrolman Hehnly's testimony that he did not see a car seat when at the house. Hearing Transcript p. 23 line 22. The court also must question A.F.'s credibility, considering she lied to police about her name, date of birth, and what happened. No other evidence or testimony was produced to counter M.G.'s story of the morning's events.

This leads the court to believe that M.G.'s statements to the police were truthful. The court finds it both clear and convincing that A.F. stabbed M.G. while he was holding the child on his chest. The court notes that M.G. had a stab wound on his forearm, which, if he were holding the child at the time, means A.F. came dangerously close to stabbing the three-month-old child. In doing so, A.F.'s actions created a reasonable likelihood of bodily injury.

Further, A.F.'s actions were at least reckless. By stabbing M.G. while he was holding the toddler, she ignored the substantial and unjustifiable risk that she might stab B.G. as well. Her ignorance of the risk was quite clearly a gross deviation from the standard of care a reasonable person would observe in her

9

situation, as the court places its faith in the belief that a reasonable person would not stab someone who is holding a three-month-old child. It is both clear and convincing to this court that, by stabbing **M.G.** ~~Mr. Grant~~ while he was holding B.G., **A.F.** ~~Ms. Fountain~~ perpetrated child abuse.

The court hypothesizes that **A.F.** ~~Ms. Fountain~~ will claim that the evidence was not sufficient enough to establish that the child was on **M.G.'s** ~~Mr. Grant's~~ chest. This goes completely against the evidence that the court heard. In **M.G.'s** ~~Mr. Grant's~~ own words – in a statement he signed – B.G. was on his chest when he was stabbed. There was no evidence presented that would lead the court to believe otherwise. But the court nevertheless humors this theory.

First, there is the fact that the officer testified that he did remember seeing any blood on B.G. However, when Patrolman Hehnly arrived at the scene, he was under the impression that **M.G.** ~~Mr. Grant~~ was stabbed somewhere else. Patrolman Hehnly had no reason to suspect that B.G. would be injured as he had no reason to believe the child was present at the stabbing. Therefore, he very likely was not specifically looking for any blood on the child. Also, when he spoke to **A.F.** ~~Ms. Fountain~~, she was holding B.G. and had blood on her hands. Therefore, it is almost impossible for the child not to have blood on her.

The court finds it more reasonable that there was blood on the child and that Patrolman Hehnly did not take sufficient notice of it to remember that fact, especially considering **A.F.** ~~Ms. Fountain~~ was holding B.G. while her hands were covered in blood. In fact, Patrolman Hehnly testified that he was too preoccupied with everything else

10

going on to even recall the child's demeanor or what she was wearing. Hearing Transcript, p. 23, lines 1–8. Therefore, the court gives little to no weight to the fact that Patrolman Hehnly did not see any blood on B.G.

The court also humors the idea that **M.G.** ~~Mr. Grant~~ removed the child from his chest before he was stabbed. Even if this occurred, the court fully believes that the child was nevertheless within the bedroom, possibly on the bed, as **A.F.** ~~Ms. Fountain~~ stabbed **M.G.** ~~Mr. Grant~~. The court can only imagine two individuals fighting, one swinging a knife, as the child lay close by. The court still believes this clearly constitutes the reckless disregard of a substantial and unjustifiable risk that the child would suffer bodily injury. Therefore, even if B.G. were on the bed or in a car seat on the floor, there was still a substantial and unjustifiable risk that B.G. could be injured either by the knife or by the parties toppling over onto her while they were fighting. A finding of abuse is nevertheless still proper regardless of where B.G. was located in the room.

It is both clear and convincing that the child was in the room with the parents at the time of the stabbing. Therefore, it is irrelevant to the court whether the child was in **M.G.'S** ~~Mr. Grant's~~ arms or in a car seat. The act of an intoxicated parent swinging a knife around while in the presence of the child is enough for this court to find that abuse occurred. The act was reckless and placed B.G. in a situation where she was likely to be harmed. The fact that she was not harmed is both a blessing and irrelevant to the finding at hand.

11

Also, the court believes that the fact that the child witnessed the attack is enough to substantiate a finding of abuse. Although the child is very young, it is unimaginable that there will be no repercussions from witnessing one parent brutally attack another with a weapon. The child was a captive observer to a horrific act of domestic violence, and such behavior is now likely engrained within the child's mind and could forever affect the child's behavior. For this reason, the court believes A.F.'s actions also recklessly caused or substantially contributed to mental injury. As such, the court believes abuse may also be found simply because the child witnessed the attack.

Lastly, the court believes this appeal may have been raised because the court initially vocalized a different standard when it made its finding.[3] This was ultimately corrected on the record. The court opines that this was a simple and harmless error. Even though the court initially mentioned a lesser standard, the court fully believes that the evidence presented is both clear and convincing. There was clearly an altercation that occurred within the residence. M.G. was clearly stabbed by A.F. Patrolman Hehnly credibly testified that M.G. gave a signed and written statement saying that B.G. was on his chest when he was stabbed. Even taking A.F.'s statement as truth that the child was in a car seat, the fact of the matter remains that all the evidence points to the fact that the child was in the

---

[3] The court initially stated there was "substantial evidence" before being asked to clarify. Hearing Transcript p. 58 lines 2–4, p. 59 lines 13–17.

room. The fact that [A.F.] was swinging around a knife in the presence of the child is enough for this court to find abuse occurred and that she was the perpetrator.

[A.F.'s] actions clearly created a reasonable likelihood that B.G. would be injured. Regardless of whether B.G. was in [M.G.'s] arms or on the floor in a car seat, when [A.F.] stabbed [M.G.], she ignored the substantial and unjustifiable risk that the child would also be injured. She therefore acted at least recklessly, if not with the knowledge that B.G. may have sustained bodily injury. If this is not clear and convincing evidence that [A.F.] perpetrated child abuse, then this court is at a complete loss.

As a final matter, [M.G.'s] signed statement to the police noted that [A.F.] drove while intoxicated and with B.G. in the car. [M.G.] gave YCOCYF an identical statement when they interviewed him. [A.F.'s] intoxication is further substantiated by the fact that [M.G.] claims she conked him on the head with a liquor bottle. The court found [M.G.'s] account of the evening's events to be credible and accurate.

The fact that [A.F.] was driving while intoxicated with a three-month-old toddler in the car is abuse in the court's eyes. By driving while intoxicated, [Ms.] [A.F.] ignored the substantial and unjustifiable risk that her actions created a likelihood that B.G. would suffer bodily injury. Her actions in taking her three-month-old toddler along for a drive while intoxicated constituted a gross deviation

13

from the standard of care that a reasonable person in her position would observe.[4] Therefore, the stabbing incident aside, the court finds that clear and convincing evidence exists to show that **A.F.** ~~Ms. Fountain~~ perpetrated child abuse by driving while intoxicated with her child in the car.

## CONCLUSION

For the foregoing reasons, this court finds by clear and convincing evidence that **A.F.** ~~Ms. Fountain~~ perpetrated child abuse upon B.G. It is respectfully requested that the Superior Court affirm this trial court's findings.

**BY THE COURT,**

*Joseph N. Gothie*

**JOSEPH N. GOTHIE, JUDGE**

---

[4] The court prays that a reasonable person would avoid driving under the influence with a three-month-old child in the car.

14