J-A27010-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.G., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  THE PHILADELPHIA | : | |
| DEPARTMENT OF HUMAN SERVICES | : | |
| (DHS) | : | |
| | : | |
| | : | |
| | : | No. 1195 EDA 2018 |

Appeal from the Order Entered March 12, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-DP-424-2018,
FID:  51-FN-467792-2009

BEFORE:  BOWES, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY BOWES, J.: **FILED MARCH 27, 2019**

The Philadelphia Department of Human Services ("DHS") appeals from the March 12, 2018 juvenile court order of adjudication that denied its request to find F.A. ("Mother") a perpetrator of child abuse against her daughter, T.G. We reverse in part and remand.

During November 2009, T.G. was born four and one-half months premature with myriad health conditions, including necrotizing enterocolitis, chronic lung problems, heart arrhythmia, ventricular tachycardia, vision delays, retinopathy, cerebral palsy, and microcephaly. Since 2010, she has been treated by a team of twenty-one medical professionals at St. Christopher's Hospital for Children ("St. Christopher's") in Philadelphia. T.G. has global developmental delay, and she is unable to speak or walk.  In addition, T.G. suffers from a swallow dysfunction that has required the

utilization of a specialized feeding tube. The child cannot chew or swallow effectively and food and liquid gets misdirected to her trachea.

DHS's involvement with the family began on January 10, 2018, after it received a December 28, 2017 child protective services ("CPS") report alleging that then-eight-year-old T.G. had missed several medical appointments and was diagnosed with failure to thrive due to chronic malnutrition. The agency asserted that Mother missed approximately eighteen appointments with T.G.'s medical specialists at St. Christopher's during that year. In addition, DHS asserted that Mother neglected to provide T.G. early intervention services ("EIS") or register her in school. The two-week delay between the CPS report and the initial meeting with Mother was based upon the agency's inability to contact Mother despite making several attempts to confront her at the family's residence, leaving correspondence for her, and talking to other family members. When the agency finally located Mother and scheduled an in-person meeting with her and T.G., the conference was twice rescheduled before it occurred on January 10, 2018. Following that meeting, Mother rejected DHS's subsequent attempts to meet with her in the home. Instead, she advised the agency, "No, it's okay, I'll see you in court." N.T., 3/12/18, at 74.

Following DHS's investigation, the CPS report was indicated for serious physical neglect based upon Mother's failure to provide medical care.[1] In addition to malnutrition, the investigative assessment highlighted that, due to T.G.'s failure to attend physical therapy and orthopedic appointments, the child's limbs had contracted, *i.e.*, the joints had stiffened into an unnatural positon. The St. Christopher's staff opined that T.G.'s ankles might have to be broken in order to correct her orthopedic condition.

On February 27, 2018, DHS filed a dependency petition and asserted that Mother's physical neglect of T.G. was tantamount to child abuse. During the ensuing hearing, DHS presented the testimony of Renee Turchi, MD, the Medical Director of the Center for Children and Youth and Special Healthcare Needs at St. Christopher's, and Melanie Davis, the DHS investigator. Mother testified on her own behalf.

As it relates to the issues raised in this appeal, Dr. Turchi testified that, between 2013 and March 12, 2018, T.G. attended only twenty-five of ninety-two medical appointments. She also indicated that T.G. was drastically underweight. Indeed, as of the date of the evidentiary hearing, eight-year-old T.G. weighed 15.6 kilograms (approximately thirty-four pounds). That weight corresponds to the average three-year-old child, and it is four standard

---

[1] A CPS report is "indicated" where "an investigation by the department or county agency determines that substantial evidence of the alleged abuse by a perpetrator exists based on . . . (i) [a]vailable medical evidence[;] (ii) [t]he child protective service investigation[; or] (iii) [a]n admission of the acts of abuse by the perpetrator." 23 Pa.C.S. § 6303(a)(1).

deviations below the zero percentile for T.G's age group. Dr. Turchi explained that T.G.'s chronic malnutrition was abnormal notwithstanding T.G.'s extensive medical diagnoses, and peculiar in light of the fact that T.G. received a specialized formula delivered to her home without any expense to Mother. She opined that T.G.'s failure to thrive was caused by Mother's failure to feed her daughter the prescribed amount. N.T., 3/12/18, at 25. In fact, noting that the specialized formula provided "one and [one-]half times the calories per ounce" than the typical mixture, she concluded, "there's no reason why [T.G.], given the proper calories, would not be gaining weight." *Id*. at 60-61. Dr. Turchi confirmed that Mother indicated that she was not feeding her daughter the recommended amount of formula. *Id*. at 62-63.

In addition, Dr. Turchi noted that T.G. had several cavities and missed all five dental appointments scheduled since 2014. *Id*. at 26-27. Likewise, she missed seventy-four of 126 physical therapy sessions scheduled since 2010. *Id*. at 29. The incomplete physical therapy contributed to the contractures in T.G.'s legs, hips, and upper arms. *Id*. at 30. Dr. Turchi highlighted that Mother declined EIS, which would have permitted T.G. to receive services at home rather than at St. Christopher's. *Id*. at 31-32, 45-46.

During her direct testimony, Mother countered that she did, in fact, provide T.G. the recommended amount of formula, but she never received the fortified formula that Dr. Turchi prescribed. She also testified that her inattentiveness to the calendar of appointments was the result of her struggle

with the death of her husband and a recent cancer diagnosis. As it relates to the contractures, Mother stated that T.G.'s orthopedic surgeon recently ordered specialized braces for the child's legs.

After hearing the evidence and the parties' countervailing arguments, the juvenile court adjudicated T.G. dependent based on Mother's neglect of T.G.'s medical needs, but declined to find Mother a perpetrator of child abuse. From the bench, the court stated, "it's quite clear that there's a failure to thrive here due to [M]other's medical neglect[.]" *Id*. at 101. Nevertheless, the court concluded, "I am not finding child abuse. I don't see enough evidence to support that." *Id*. Thereafter, the juvenile court entered an order of adjudication and disposition that memorialized its finding that T.G. was a dependent child, and formally denied DHS's request for a finding of child abuse as to Mother.

DHS appealed and complied with Pa.R.A.P. 1925(a)(2)(i) by filing a concise statement of errors complained of on appeal wherein it asserted two substantive issues. DHS combined its issues for our review as follows: "Whether the trial court erred as a matter of law and abused its discretion when it declined to find child abuse against [Mother] where there was uncontroverted evidence of serious physical neglect, and where the trial court found that there was 'failure to thrive . . . due to [Mother's] medical neglect'"? DHS brief at 6. The guardian *ad litem* submitted a letter to this Court, wherein it joined the brief filed by DHS.

Our standard of review is as follows:

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citations omitted); *see also In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted).

While dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301–6375, the Child Protective Services Law ("CPSL") controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence. *See In the Interest of J.R.W.*, 631 A.2d 1019 (Pa.Super. 1993). As the Supreme Court explained in *In the Interest of L.Z.*, *supra* at 1176, "[as] part of [a] dependency adjudication, a court may find a parent to be the perpetrator of child abuse," as defined by the CPSL. Instantly, DHS's petition for an adjudication of dependency asserted that Mother's neglect of T.G.'s nutrition and physical wellbeing was tantamount to child abuse. Although the juvenile court adjudicated T.G. dependent, it declined to level a finding of child abuse. For the reasons explained below, we find that the court abused its discretion in rejecting DHS's request to find Mother a perpetrator of child abuse.

The CPSL defines child abuse, in pertinent part, as follows:

**(b.1) Child abuse.--**The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:

. . . .

(7) Causing serious physical neglect of a child.

23 Pa.C.S. § 6303(b.1)(7). In this vein, the Juvenile Act describes "Serious physical neglect" as, *inter alia*, "The failure to provide a child with adequate essentials of life, including food, shelter or medical care" which "endangers a child's life or health, threatens a child's well-being, causes bodily injury or impairs a child's health, development or functioning." 23 Pa.C.S. § 6303(a).

Similarly, in defining intentionally, knowingly, and recklessly, the CPSL refers to the Crimes Code definitions, in relevant part:

**(b) Kinds of culpability defined.--**

(1) A person acts intentionally with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

(ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b). Instantly, in determining Mother's culpability, the material element of DHS's allegation of child abuse is Mother's serious neglect of T.G.

In rejecting DHS's request for a finding of child abuse, the juvenile court reasoned that the agency failed to demonstrate by clear and convincing evidence that T.G.'s condition, *i.e.*, her malnutrition and contractures, was the result of "Mother's inability to take the Child to medical appointments or not feeding the Child properly." Trial Court Opinion, 7/20/18, at 5. Specifically, the court reasoned that "the child was born with such preexisting health conditions that DHS was unable to show child abuse by clear and convincing evidence because the Child's hardships were just as likely or more likely to be caused by [the] preexisting medical conditions than by child abuse or serious physical neglect." *Id*. In support of this rationale, the court highlighted that, although Dr. Turchi treated T.G. for approximately eight years, she did not contact DHS about the child's condition until December 2017. Similarly, the

- 8 -

court stressed that, in diagnosing T.G. with failure to thrive, Dr. Turchi "never indicated that this was a child abuse" case. ***Id***. Hence, the court reasoned that T.G.'s frail physical condition was the result of Mother's struggle with her cancer diagnosis, chemotherapy treatment, and her husband's recent death rather than serious physical neglect.

DHS argues that the juvenile court committed reversible error by ignoring uncontroverted evidence of Mother' reckless serious physical neglect of T.G. It asserts that, notwithstanding T.G.'s preexisting severe medical conditions, Mother neglected to provide her daughter with the adequate essentials of life, including food and medical care which not only threatened the child's well-being but impaired her development. Our review of the record supports the agency's contention.

Instantly, it is beyond peradventure that Mother failed to provide T.G. with the adequate essentials of life, *i.e.*, food, and medical care. It is similarly evident that Mother's neglect endangered T.G.'s well-being. The certified record bears out that Mother missed more than two-thirds of T.G.'s medical appointments and deprived T.G. of adequate nourishment, as evidenced by the fact that the eight-year–old child weighed as much as the average three year old.

The juvenile court's explanation and decision to adjudicate T.G. a dependent child acknowledges Mother's neglect and appears to recognize the causal relationship between Mother's behavior and her daughter's appalling

physical condition. Indeed, during the hearing, the court observed "that [T.G.] is not [receiving] the right amount of formula" and that "there's no question that there's been medical neglect by [M]other." N.T., 3/12/18, at 62, 100. Nevertheless, given the child's preexisting conditions and Mother's personal problems, the juvenile court declined to find the palpable neglect was tantamount to child abuse. Central to the court's decision was the trio of considerations that: (1) T.G. suffered from extensive preexisting conditions; (2) Dr. Turchi treated T.G. for eight years before she contacted DHS about her concerns with Mother's care; and (3) Dr. Turchi did not render a formal diagnosis of child abuse. Furthermore, the juvenile court's rationale is based on the implicit finding that Mother's acknowledged neglect of T.G. was the result of her personal circumstances and, therefore, not intentional, knowing, or reckless. Our review of the certified record belies the juvenile court's perspective.

As stated previously, a person acts recklessly in this context if she consciously disregards a substantial and unjustifiable risk that the serious neglect exists or will result from her conduct. As the statute requires, "[t]he risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation." 18 Pa.C.S. § 302(b)(3).

During the evidentiary hearing, Dr. Turchi testified that Mother never mentioned that she had any difficulty feeding T.G. or maintaining the scheduled medical appointments. N.T., 3/12/18, at 24. Similarly, Mother did not inform Dr. Turchi about her cancer diagnosis or her husband's death until the child's penultimate medical appointment with Dr. Turchi. *Id*. at 17-18. There was no medical explanation for T.G.'s malnourishment beyond Mother's failure to feed her daughter the prescribed specialized formula that was shipped directly to the home. When asked whether she was concerned about Mother's ability to provide her daughter the appropriate nutrition, Dr. Turchi opined, "we're concerned . . . that [T.G. is] not getting everything that she needs to sustain her weight." *Id*. at 24. Dr. Turchi explained, "In this case, . . . you have to assume . . . [T.G. is] not receiving everything that [we are] prescribing." *Id*. Ultimately, Dr. Turchi concluded, within a reasonable degree of medical certainty that T.G. has not ingested the correct amount of formula required to sustain an adequate weight. *Id*. at 25.

In addition to the foregoing testimony about T.G.'s malnutrition and the numerous missed appointments with health care specialists, dentist, and physical therapists, Dr. Turchi testified about Mother's failure to look after her daughter's well-being. Specifically, Mother neglected to arrange for T.G. to obtain a custom wheelchair or activity chair for the home. *Id*. at 32-33. T.G. is immobile and completely dependent upon other people to carry her about. *Id*. at 48. Mother's omission was troubling because increased mobility would

have permitted T.G. to participate in activities, go outside, and attend school. *Id*. at 34. Dr. Turchi explained, "ideally, for her quality of life, it would be great for her to have equipment that allows her to [participate] . . . to the best of her ability." *Id*. Similarly, despite the medical staff's repeated suggestions that Mother enroll T.G. in public school, even recommending specific schools that would be appropriate for the child's needs, Mother obstinately refused to register T.G. in any school, at least until after DHS became involved with the family. *Id*. at 34-35.

As it relates to the juvenile court's specific concerns regarding Dr. Turchi's delay in contacting DHS about Mother's medical neglect of T.G., Dr. Turchi explained that, while the medical staff had concerns about T.G.'s wellbeing for several years, it delayed contacting DHS in the hope that Mother would ultimately rectify the situation. Dr. Turchi testified that her staff was aware that Mother had experienced adversity and appeared overwhelmed at times. However, it extended to Mother the benefit of the doubt that she would rebound, overcome her problems, and care for her daughter. Dr. Turchi described how it was not until that penultimate medical appointment with T.G. that she realized the urgency that would be required to counter Mother's prolonged neglect. She articulated this realization as follows:

> [W]ith all due respect to you at DHS, it's not something our team generally likes to do unless we have to. So, yeah, I guess I have to -- and my team, you know, have to own the fact that some of this has been longstanding, and we just were hoping that things would turn around.

. . . .

[T]he reason that our social worker on our team, you know, reached out recently was just the -- you know, the significant falling off the [growth] curve that was persistent. And we were trying to reach mom, and sent letters, and wanted to, you know, try to figure out again what had happened with the [weight] loss . . . and, you know, just in looking at her malnourished state, we just felt like it really -- **we couldn't wait any longer**.

. . . .

I -- **I'm really concerned about [T.G.'s] state right now**, and her growth . . . and her appointments and . . . how she looked when . . . I last saw her.

*Id*. at 41-42 (emphases added). To the extent that Dr. Turchi's hesitation to contact DHS was based upon her concern over Mother's potentially adversarial reaction to agency involvement, her reluctance proved prophetic. Mother discontinued using Dr. Turchi as T.G.'s primary care physician immediately after St. Christopher's communicated with DHS during December 2017. *Id*. at 54, 56.

As noted *supra*, Mother countered that she did not miss as many appointments as Dr. Turchi indicated. *Id*. at 83. She stated the she may have missed some appointments during 2016 due to her husband's sickness and ensuing death. *Id*. at 84. In addition, she battled stage III colon cancer during 2017. The initial round of chemotherapy occurred between May and November of that year. *Id*. Mother initiated a second round of chemotherapy during March 2018, one week prior to the hearing. *Id*. As it relates to T.G.'s current care, Mother testified that she has two adult children that are willing

- 13 -

to assist her with transporting the child to her medical appointments. *Id*. at 84-85. She also indicated that she enrolled the child in school during February 2018, but was told that the child could not matriculate until she obtained a personal nurse to provide individual care during the school day. *Id*. at 85. Mother stated that she is in the process of completing the paperwork to obtain the nurse. *Id*. at 86. She proffered no explanations as to why she did not take any of these steps prior to DHS's involvement.

In addition, Mother testified that her daughter's contractures can be rectified without the surgical procedure that Dr. Turchi referenced. *Id*. at 87. Likewise, in relation to T.G.'s malnutrition, Mother testified that she fed her daughter the correct amount of formula and always followed Dr. Turchi's recommendations. *Id*. Paradoxically, Mother then testified that, while Dr. Turchi advised her that St. Christopher's would order the high calorie formula, Mother did not receive it.

During cross-examination, Mother conceded that she never asked either of her adult children to transport T.G. to her medical appointments "[b]ecause, I never wanted them to." *Id*. at 89. In fact, even when Mother was too sick or overwhelmed with emotional problems to take the child to appointments herself, she elected to forego the siblings' assistance. *Id*. Likewise, Mother admitted that, while she is **currently** willing to accept in-home services, she previously rejected entreaties to utilize identical services. *Id*. She explained, "I'm dealing with my health issues, and I don't want someone in and out of

my house every couple of days." *Id*. at 90. Similarly, Mother contested Dr. Turchi's testimony regarding the missed dentist appointments. She attested that a dentist examined T.G. during 2016, and indicated that T.G. could not receive dental care due to her inability to swallow. *Id*. 90-91. Mother also stressed that T.G. attended physical therapy during 2014 and 2015, and that she did not schedule sessions during 2016 because of complications T.G. endured following an earlier surgical procedure related to the feeding tube. *Id*. at 92.

Even in light of Mother's explanations for her inaction, the foregoing evidence of record belies the juvenile court's implicit conclusion that Mother's conduct was neither intentional, knowing, nor reckless. Stated plainly, Mother's adamant refusal to accept assistance with maintaining T.G.'s calendar of appointments and her affirmative decision to ignore the recommendations of the medical staff treating T.G.'s serious medical needs is evidence of her conscious disregard of the substantial and unjustifiable risk of further impairing her daughter's health.

In *In re L.Z.*, *supra* at 1175, our Supreme Court concluded that a severe diaper rash and yeast infection in a twenty-one-month old child constituted "serious physical neglect" justifying a finding of child abuse. Significantly, in reaching its decision, the High Court noted that both the treating physician and the juvenile court rejected the mother's explanation for the diaper rash. Conversely, in *A.B. v. Department of Public Welfare*, 869

- 15 -

A.2d 1129, 1133-34 (Cmwlth. 2005), our sister jurisdiction concluded that, without evidence of additional medical problems, a two ounce weight loss in a three month-old child was not tantamount to serious physical neglect that warranted classifying the mother as a perpetrator of child abuse.  In as much as both Dr. Turchi and the juvenile court concluded that Mother's medical neglect was responsible for T.G.'s severe malnutrition, the instant case aligns with our Supreme Court's holding in **In re L.Z.**, rather than our sister court's determination in **A.B.**

Between 2013 and 2018, Mother took her daughter to only twenty-five of ninety-two scheduled medical appointments.  Despite receiving assistance with scheduling and transportation, she missed an astounding sixty-seven appointments over that five-year period.  Furthermore, over two-thirds of the sixty-seven absences were unexcused because Mother neglected to provide any explanation for the absences.  During 2017, the year that DHS initiated the CPS investigation, Mother presented T.G. for only two of nineteen medical appointments, and all but one of those seventeen absences were unexplained.  While that year coincides with Mother's chemotherapy treatments, she does not explain why she refused to permit her adult children to accompany T.G. to the appointments, why she declined in-home services that would have alleviated the need to travel to St Christopher's, or why she failed to attend the appointments during the four preceding years.  For example, although St. Christopher's scheduled fifty-eight medical appointments between 2014 and

2015, Mother had more no-shows (twenty-two) than appointments that T.G. actually attended (nineteen). Similarly, during 2016, T.G. attended only one of the four scheduled appointments, and Mother neglected to inform the physicians of any of those cancelations.

Moreover, we observe that, while Mother's physical and mental health problems arguably may have impacted her ability to attend medical appointments, it does not explain Mother's failure to feed her child as the medical team recommended. The trial court comprehended this reality, stating "There's clearly medical neglect here, and it's been going on for a while[.] . . . [T]here's no question that there's been medical neglect by [M]other." N.T., 3/12/18, at 100.

Dr. Turchi advised Mother of the consequences of failing to comply with her daughter's feeding protocol. Nevertheless, Mother failed to inform Dr. Turchi of any difficulties with following the established regimen. While Mother testified that she fed her daughter in accordance with the recommended schedule, she stated that she never received the fortified formula that Dr. Turchi prescribed to combat T.G.'s failure to thrive. Pointedly, however, even to the extent that Mother's assertion is accurate, Mother chose not to inform anyone of that development. Thus, rather than alert the medical staff to her dilemma, Mother elected to continue the prior feeding regime, which had been proven to be an inadequate solution to T.G.'s malnutrition. In this extreme situation, where the eight–year-old child suffers from chronic malnutrition to

the degree that a fortified diet was essential, Mother's omission is no less egregious than a willful refusal to provide the required nourishment. In either scenario, whether through malfeasance or nonfeasance, the fact persists that Mother, the sole person responsible for T.G.'s sustenance, failed to provide T.G. with the necessary nutrition. At a minimum, Mother's disregard evinces a "gross deviation from the standard of conduct that a reasonable person would observe in [her] situation." 18 Pa.C.S. § 302(b)(3) (defining recklessness).

While we are sympathetic to the burdens that Mother faced during 2016 and 2017, her mental and physical health problems do not negate the prior years of neglect that the eight-year-old child endured. Due to T.G.'s existing conditions, Mother was required to provide her daughter heightened medical care. Regardless of Mother's personal issues, she was derelict in caring for T.G. The child is emaciated and even if T.G. does not require an invasive corrective procedure to rectify the failed physical therapy, under the most favorable scenario, she will be required to wear braces on her legs. However, Dr. Turchi explained that even a passive measure may necessitate a prerequisite surgery because the child's feet are misaligned. Thus, contrary to the juvenile court finding of fact, T.G.'s current physical state is not a consequence of her premature birth, and her preexisting conditions caused neither her chronic malnutrition nor her contracted limbs.

In actuality, the certified record confirms that T.G.'s current conditions are the direct result of Mother's conscious disregard of the substantial and unjustifiable risk that her neglect of T.G.'s essential needs would impair her health and development. Dr. Turchi testified that Mother, rather than any preexisting condition, caused T.G.'S malnutrition. While the trial court was not required to accept Dr. Turchi's expert medical opinion, the trial court's countervailing conclusion must be supported independently by the record. *Compare In re Bosley*, 26 A.3d 1104, 1111 (Pa.Super. 2011) ("[A] trial court has discretion to accept or reject a witness' testimony, including that of an expert witness, and is free to believe all, part, or none of the evidence presented."), *with Nomland v. Nomland*, 813 A.2d 850, 854 (Pa.Super. 2002) ("To say that a court cannot discount uncontradicted evidence, however, is merely to rephrase the requirement that a [trial] court's conclusion have competent evidence to support it."). Instantly, the certified record is bereft of any evidence that would sustain the court's conclusion that eight-year-old T.G.'s current diagnosis of failure to thrive is the result of preexisting conditions. To the contrary, the certified record supports the expert conclusion of Dr. Turchi.

Mother's lack of attention to T.G.'s feeding program was appalling and she essentially abandoned her daughter's medical care and physical therapy. Even accepting that Mother was too sick or overwhelmed to bring her daughter to medical appointments, there is no dispute that she rejected all efforts to

have other people transport T.G. to the hospital or have the services performed in her residence. Thus, in order to benefit Mother while Mother coped with her personal problems, T.G. was denied the basic essentials of life. The failure to provide T.G. with adequate food or medical care is tantamount to serious physical neglect insofar as it threatened the child's well-being and impaired her health and development. Accordingly, the record does not support the juvenile court's decision to forgo finding that Mother's neglect was tantamount to child abuse pursuant to § 6303(b)(1).

Likewise, we are not persuaded by the juvenile court's references to Dr. Turchi's hesitation to contact DHS about T.G's condition and the omission of a former diagnosis of child abuse. Dr. Turchi explained her reluctance. Specifically, she attempted to give Mother the benefit of the doubt that Mother would rectify the deficiencies and the doctor made repeated outreach to assist Mother in that endeavor. However, after observing the extent to which T.G.'s malnourishment had progressed, Dr. Turchi immediately alerted DHS. As it relates to the absence of a medical diagnosis, in describing the cause of T.G.'s physical condition, Dr. Turchi testified within a reasonable degree of medical certainty that the diagnosis of malnutrition was related to Mother's failure to feed T.G. the necessary formula. Regardless of whether Dr. Turchi made a medical diagnosis of child abuse in these circumstances, it was error for the trial court to ignore Mother's responsibility for T.G.'s actual physical state and conclude that Mother's obvious medical neglect was not serious physical

neglect that is tantamount to child abuse pursuant to 23 Pa.C.S. § 6303(b.1)(7) of the CPSL.

For all of the foregoing reasons, we reverse the portion of the juvenile court's March 12, 2018 order of adjudication and disposition that denied DHS's request for a finding of child abuse as to Mother. The order of adjudication and disposition is affirmed in all other respects.

Order reversed in part and remanded for further proceedings consistent with his memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/27/19