J-A19031-23

2023 PA Super 235

| IN THE INTEREST OF: S.A.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: DEPARTMENT OF HUMAN SERVICES | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 504 EDA 2023 |

Appeal from the Order Entered February 8, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000554-2022

BEFORE: BOWES, J., STABILE, J., and PELLEGRINI, J.*

OPINION BY PELLEGRINI, J.: **FILED NOVEMBER 13, 2023**

The Philadelphia Department of Human Services (DHS) appeals from the order entered in the Court of Common Pleas of Philadelphia County (trial court) dismissing its petition for dependency of S.A.S. (Child, d.o.b. 8/21) and finding S.S. (Mother) and C.C. (Father) (collectively, Parents) did not abuse Child. DHS also challenges the trial court's decision not to certify Dr. Zachary Miller as an expert in child abuse medicine. Because we conclude that DHS presented clear and convincing evidence to support dependency and child abuse, we reverse and remand.

_____

* Retired Senior Judge assigned to the Superior Court.

**I.**

**A.**

DHS received a Child Protective Services (CPS) report on March 28, 2022, "alleging that bodily harm had been caused to [Child] through a recent act/failure to act." (Dependency Petition, 6/10/22, at ¶ 5(b)). Specifically, that seven-month-old Child had presented at the Children's Hospital of Philadelphia (CHOP) Emergency Department with multiple unexplained fractures and the CHOP team suspected abuse. On June 10, 2022, DHS filed a dependency petition (Petition) alleging that "the child is at risk of further abuse and/or neglect in the care of the parents." (***Id.*** at ¶ 6). After multiple continuances, a hearing was held on February 8, 2023. DHS supervisor Cheryl Priest, Turning Points Community Umbrella Agency (CUA) case manager Liberty Bruce, and pediatrics expert Dr. Zachary Miller testified on behalf of DHS. Parents did not testify or present any evidence.

**B.**

Ms. Priest testified that DHS received the CPS report on March 29, 2022, that alleged Child presented to the CHOP emergency room and upon examination, was discovered to have multiple fractures and bruising on her wrist, ribs and elbows that were determined to be non-accidental. The report was indicated against Child's Parents, with Child as the named victim and Parents and the maternal great-grandmother as the perpetrators. The CPS

report stated that the Parents caused bodily injury to Child through a recent act or failure to act.

Mother told DHS that two weeks prior to bringing Child to CHOP, she became aware of an issue when Child's maternal aunt noticed that Child's arms looked a little different. From that point on, Mother paid more attention to the appearance of Child's arms, ultimately bringing her to CHOP. She had no explanation for the fractures. When asked whether Father had any explanation for Child's injuries, Ms. Priest said he did not, but that he "mention[ed] he had been co-sleeping with [Child] during the times that he was watching her when they would take naps or whatever, but that was the only explanation that he had." (N.T., 2/08/23, at 13). Parents did not identify any other caregivers for Child other than themselves and maternal great-grandmother.

On cross-examination, Ms. Priest stated that the Parents showed appropriate concern for Child's well-being and cooperated with the DHS investigation. Mother had no prior history with DHS before the March 2022 report. At the time of the DHS investigation, Mother was attending school Monday through Friday from 8:00 a.m. to 3:00 p.m. During those periods, Child was with Father and maternal great-grandmother. Several weeks before the injury was reported, Father began a new job with a schedule that mirrored Mother's, so maternal great-grandmother cared for Child during these eight

hours. Ms. Priest testified that a home assessment had been completed and the Parents' home was appropriate for Child.

**C.**

Ms. Bruce testified that she is the CUA case manager for Child. Child has been living with her paternal aunt since the reports came in and has not suffered any new broken bones or other injuries since she has been out of Parents' care. Mother suggested to Ms. Bruce that maybe Child's injuries occurred because she had tripped on the stairs with Child in her car seat and had to bend her arm to put on her jacket. Father had no explanation for the fractures. Parents engaged in regular visits supervised by paternal aunt and were cooperative with meeting Child's needs, with Mother being the parent who was primarily involved. Mother had participated in case planning meetings, and Parents had completed a parenting class. When asked if she saw any dependency issues with Parents other than the injuries, Ms. Bruce responded, "I suppose not." (N.T., at 55).

**D.**

**1.**

Dr. Miller testified that he has been trained as a pediatric physician and is on the child protection team at CHOP. His training included four years of medical school, a three-year pediatric residency and, at the time of the hearing, he was in the CHOP fellowship program for child abuse pediatrics, having completed one-and-a-half years of the three-year program. He has

conducted trainings on pediatrics and child abuse and has had specific training in identifying child abuse. Although he is not board certified in child abuse pediatrics, he will be eligible for board certification at the end of his fellowship training.

Dr. Miller has been involved in over 100 consultations involving child abuse concerns, with a minority of those cases having a very high degree of concern and a substantial number being of little to no concern. He also receives continuing education on identifying child abuse or nonaccidental injuries. All of the tests and methods he used in this case are supported by peer-reviewed scientifically supported data and he has been authorized as an expert in approximately ten or eleven cases.

Mother and Father's counsel both objected to Dr. Miller being certified as an expert in child abuse pediatrics because he is not yet board certified in the specialty. The court agreed and certified Dr. Miller as an expert in pediatrics but not child abuse.

**2.**

Dr. Miller testified that he met Child on the inpatient unit at CHOP when he performed her examination and consultation. Child's presenting issue was an abnormal appearance of the right arm and the difference in how the arms were being used, but there was no bruising. Multiple fractures were identified. The x-ray of Child's right arm identified a fracture of the distal humerus (bone of the upper arm near the elbow at the elbow). Child did not have any history

that would explain how this fracture occurred. The standard procedure in these circumstances is to perform an evaluation, including a skeletal survey and x-rays, for any other injuries that had not been identified. Child's skeletal survey identified an additional healing fracture of the left humerus and of the left sixth rib.

Child was rolling over but not ambulatory. She was developmentally "on track" and Dr. Miller did not observe any behavior that was abnormal for her age. (N.T., at 28). Mother was unable to provide any explanation for the fractures other than Father played rambunctiously with Child, but nothing unusual. She told Dr. Miller that when Child was approximately two to three months' old, she noticed Child using her right arm a little differently than the left, but family members reassured her about it. It was not until maternal aunt mentioned that Child's right elbow looked slightly different that Mother started noticing it herself and brought Child to CHOP.

Dr. Miller explained that the fractures were healing since the x-rays showed new bone forming. The signs of healing would begin to appear approximately ten to fourteen days after the humerus injury and seven to ten days after the injury to the rib. The right arm fracture was visible in a photograph as "a little bit of curvature" on the inner part of her elbow. (N.T., at 29); (*see* DHS Exhibit 5, photograph "O").

CHOP tested Child for other bone conditions that could have caused her injuries. Dr. Miller explained that her blood tests for vitamin D and electrolytes

were normal and that she tested negative for osteogenesis imperfecta ("OI"), a genetic condition that can predispose a patient to fractures. Dr. Miller also reviewed the skeletal survey with the radiology team, and they did not identify any abnormal or unhealthy appearance in her bones. Based on this evaluation, Dr. Miller concluded that Child had no medical predisposition to fractures and that her injuries were the result of trauma.

Dr. Miller also stated that as a non-mobile infant, Child could not have caused the injuries herself, unlike an older child who could walk independently. He explained that Child's fractures were concerning for child abuse because it was an abnormal fracture pattern for a single injury event like a fall and that most fractures of the rib are the result of inflicted injury. Dr. Miller stated that this conclusion was supported by the medical literature regarding the identification of injuries that are indicative of abuse: "This is a very well-studied phenomenon." (N.T., at 33).

Dr. Miller noted that Child did not appear to be in pain at the time of his evaluation since the bones were healing but, when asked if a fracture would be painful for a child, he stated, "Yes, I would expect that." (*Id.* at 34). He explained that an infant would usually display pain around the time of the injury by crying or fussiness but was not permitted to answer counsel's question about whether a reasonably prudent parent would notice this issue. The doctor was unsure whether Child was at risk for any loss of mobility due to her injuries.

Dr. Miller stated that the CHOP child protection team's assessment was that Child's injuries "were the result of trauma and represented a significant degree of concern for nonaccidental trauma or inflicted injury." (**Id.** at 36); (**see also** DHS Exhibit 6, Dr. Miller Report, 4/17/22, at 24) ("With the information available at this time, the findings remain highly concerning for inflicted trauma/child physical abuse."). When counsel asked for Dr. Miller's opinion about whether Child's injuries were the result of child abuse, the court sustained the objection of Mother's counsel that the opinion was beyond the scope of Dr. Miller's expertise.

On cross-examination by Mother's counsel, Dr. Miller conceded that although OI testing identifies "a significant majority" of the genetic variants of this condition, it does not identify all of them. (N.T., at 40). Father's counsel asked Dr. Miller whether Child was tested for rickets and rare bone fragility syndromes such as Cole Carpenter Syndrome, Bruck Syndrome or McCune-Albright Syndrome and whether Parents or any relatives were tested for familial osteoporosis. Dr. Miller responded that Child had vitamin D testing for rickets, which came back normal. He stated that tests for osteoporosis or McCune-Albright Syndrome were not indicated. (Familial osteoporosis not indicated because no family history of fractures; McCune-Albright Syndrome not tested because Child had no physical abnormalities that would signal that such testing would be appropriate). Child was not tested for Bruck Syndrome

and Dr. Miller was unsure what the medical evaluation would be to test for Cole Carpenter Syndrome.

Dr. Miller explained on re-direct that the syndromes are not part of CHOP's testing protocol and he is not familiar with all of them, but that he would expect to see abnormalities on the x-ray that was performed if any of them were present.

**E.**

At the close of the evidence the trial court concluded that DHS did not meet its burden with respect to child abuse or dependency and discharged the petition. DHS timely appealed and filed a contemporaneous statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i).

DHS raises several questions for this Court's review, which we consolidate into three. Whether the court (1) abused its discretion in refusing to certify Dr. Miller as an expert in child abuse pediatrics; (2) abused its discretion in denying DHS's request for a finding of child abuse; and (3) abused its discretion in declining to adjudicate Child dependent where DHS met its burden of proving child abuse. (*See* DHS's Brief, at 3-5).

**II.**

DHS argues that the trial court abused its discretion in refusing to certify Dr. Miller as an expert in child abuse pediatrics solely based on the fact that he is not yet board certified for that specialty because board certification is not required to be qualified as an expert in a medical field where the doctor

has extensive experience in it.[1]  Mother responds that the court did not solely rely on the lack of board certification and, in fact, explicitly agreed that this is not a litmus test on the issue.  Instead, the court evaluated and weighed the evidence and determined that Dr. Miller's experience and qualifications were insufficient to allow his expert testimony on the specific area of child abuse pediatrics.  Moreover, argues Mother, even if it were error, it is harmless.

**A.**

Pursuant to Pennsylvania Rule of Evidence 702, an expert may testify:

> if scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training **or** education may testify thereto in the form of an opinion or otherwise.

Pa.R.E. 702 (emphasis added).

"[T]he standard for qualification of an expert witness is a liberal one."

***Wright v. Residence Inn by Marriot, Inc.***, 207 A.3d 970, 976 (Pa. Super.

_____

[1] Our standard of review of this issue is very narrow:

> The admission or exclusion of evidence, including the admission of testimony from an expert witness, is within the sound discretion of the trial court....  [W]e may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law.  To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

***In re Estate of Byerley***, 284 A.3d 1225, 1239 (Pa. Super. 2022) (citation omitted).

2019 (citation omitted). "When a witness is offered as an expert, the first question the trial court should ask is whether the subject on which the witness will express an opinion is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman." ***Wexler v. Hecht***, 847 A.2d 95, 99 (Pa. Super. 2013), *aff'd.*, 928 A.2d 973 (Pa. 2007) (citations and internal quotation marks omitted). "If so, the next question the court should ask is whether the witness has sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." ***Id.*** (citations and internal quotation marks omitted). "The witness need not possess all of the knowledge in a given field but must only possess more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience." ***Wright***, 207 A.3d at 976 (citation and internal quotation marks omitted). "If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine in view of the expert's particular credentials." ***Id.*** (citation and internal quotation marks omitted).

"We have held regarding medical experts that experts in one area of medicine may be found to be qualified to address other areas of specialization where the specialties overlap in practice, or where the specialist has had experience in a selected field of medicine." ***Id.*** (citation omitted). "A witness having "**any** reasonable pretension to specialized knowledge on a given

subject should be allowed to testify as an expert witness even though they are not the 'best possible witnesses' available." *Id.* at 978 (citation and brackets omitted; emphasis in original). "[T]he strength of [the expert]'s credentials, relevant to the issues in [the] case, goes to the weight of his testimony, not its admissibility." *Id.*

The trial court observed that "board certification is not a litmus test of qualification to offer an expert opinion." (Trial Court Opinion, 5/11/23, at 13). However, after "evaluat[ing] and weigh[ing] the evidence regarding the training and experience Dr. Miller has acquired to date," it determined Dr. Miller's experience and qualifications were insufficient to admit his testimony and opinion in the area of child abuse pediatrics. (*Id.* at 6-7). The record does not support this decision.

Dr. Miller is a licensed pediatric physician and receives continuing education on identifying child abuse or nonaccidental injuries. (*See* N.T., at 19-20). He has conducted trainings on pediatrics and child abuse and has had specific training in identifying child abuse. (*See id.* at 19). Dr. Miller has completed half of his three-year fellowship program on child abuse pediatrics at the end of which he will be eligible to become board certified in the specialty. (*See id.* at 20, 22). Dr. Miller has been involved in over 100 consultations involving child abuse concerns and he has been authorized as an expert in approximately ten or eleven cases. (*See id.* at 21). Finally, he is a fellow physician on the child protection team at CHOP. (*See id.* at 19).

Based on this training and experience, it is evident that Dr. Miller has more knowledge than is otherwise within an ordinary layman's range of training, knowledge, intelligence or experience. The strength of his credentials to testify about child abuse pediatrics goes to the weight of his testimony, not its admissibility. *See Wright*, 207 A.3d at 978 (concluding trial court abused its discretion in precluding medical expert from testifying where he had a reasonable pretension to specialized knowledge even though he was not board certified in the specific area). Consequently, we conclude that the trial court abused its discretion in precluding Dr. Miller from testifying as a child abuse pediatrics expert at the hearing. However, this does not end our inquiry because the mere failure to qualify Dr. Miller as a child abuse pediatrics expert does not mandate a new adjudicatory hearing unless DHS can show prejudice. *See Byerley*, 284 A.3d at 1239.

## B.

DHS argues that the trial court's error was not harmless because, although Dr. Miller testified as an expert pediatrician, he was not allowed to give his opinion about the ultimate issue in the case, *i.e.*, whether Child actually **was** abused. However, DHS has failed to show that the outcome of the proceeding would have been different if Dr. Miller had been certified as a child abuse pediatrician and was allowed to offer his opinion as an expert on child abuse.

"The trier of fact is not bound by the testimony of any expert witness and is under no obligation to accept the conclusions of an expert witness." ***Murphey v. Hatala***, 504 A.2d 917, 922 (Pa. Super. 1986), *appeal denied*, 533 A.2d 93 (Pa. 1987).  However, "while a trial court is not required to accept the conclusions of an expert witness … , it must consider them, and if the trial court chooses not to follow the expert's recommendations, its independent decision must be supported by competent evidence of record."  ***Nelson v. Kresge***, 273 A.3d 1068, at *13 (Pa. Super. filed Feb. 23, 2022) (unpublished memorandum) (citation omitted).[2]

The court thoroughly weighed Dr. Miller's testimony and there is no indication that had Dr. Miller expressly given an opinion on the ultimate issue that it would have altered the court's conclusion where the record reflects that Dr. Miller's opinion about the injuries was clear.  Dr. Miller testified at length as an expert in pediatrics about Child's injuries, her lack of predisposition for such fractures, and the tests that were run which showed her to be otherwise healthy.  (***See*** N.T., at 24-47).  He testified that Child's diagnosis in March 2022 was "that her injuries were the result of trauma and represented a significant degree of concern for nonaccidental trauma or inflicted injury." (***Id.*** at 36).  The court permitted the admission of Dr. Miller's report, which

---

[2] Unpublished decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value.  ***See*** Pa.R.A.P. 126(b).

included his opinion that "the findings remain highly concerning for inflicted trauma/child physical abuse." (DHS Exhibit 6, Dr. Miller's Report, at 24).

The court represents it "considered that evidence and assigned it the weight that [it] deemed appropriate." (Trial Ct. Op., 5/11/23, at 14). This was within its discretion and there is no indication that the outcome of the proceedings would have been any different had Dr. Miller's opinion been offered as a pediatrics child abuse physician rather than just a pediatrician. Therefore, although we conclude that the trial court abused its discretion in failing to qualify Dr. Miller as an expert child abuse pediatrician, DHS has failed to establish prejudice. A new adjudicatory hearing is not warranted under these circumstances. *See Byerley*, 284 A.3d at 1239.

## III.

DHS next argues that the trial court erred in refusing to find child abuse where, even without qualifying Dr. Miller as a child abuse expert, his testimony "provided decisive proof that [Child]'s injuries were caused by [] abuse." (DHS's Brief, at 23).[3] Further, they maintain that the trial court's reliance on

_____

[3] Our standard of review of this matter is well-settled:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*(Footnote Continued Next Page)*

the hypothetical possibility that Child's injuries were caused by co-sleeping or a rare bone fragility syndrome was not supported by the record.

Although "dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301–6375, the Child Protective Services Law ("CPSL")[, 23 Pa.C.S. § 6301-6388,] controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence." *Interest of T.G.*, 208 A.3d at 490 (citation omitted).[4] The CPSL defines "child abuse," in pertinent part, as "intentionally, knowingly or recklessly … [c]ausing bodily injury to a child through any recent act or failure to act." 23 Pa.C.S. § 6303(b.1)(1). "Bodily injury" is an "impairment of physical condition or substantial pain." 23 Pa.C.S. § 6303(a). Under the Juvenile Act, a court may

_____

*Interest of T.G.*, 208 A.3d 487, 490 (Pa. Super. 2019), *appeal denied*, 211 A.3d 750 (Pa. 2019) (citation omitted). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *Id.* (citation omitted). "A trial court's decision constitutes an abuse of discretion only if it is manifestly unreasonable or is the product of partiality prejudice, bias, or ill-will. *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). An abuse of discretion will not result merely because the reviewing court might have reached a different decision because "we are not in a position to make the close calls based on fact-specific determinations." *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

[4] "Whether one suffered such pain or impairment is a determination within the purview of the trial court, which sits as the finder of fact[,]" and "[t]his Court is not in a position to re-weigh evidence." *Burns v. Burns*, 276 A.3d 222, at *5 (Pa. Super. filed Mar. 8, 2022) (unpublished memorandum) (citations omitted). However, this Court need not defer to determinations that are not supported by the record or are manifestly unreasonable. *See In re K.H.B.*, 107 A.3d 175, 183 (Pa. Super. 2014).

adjudicate a child dependent based on a child abuse finding. *See* 42 Pa.C.S. § 6302.

DHS has the burden of establishing child abuse by clear and convincing evidence. *See In re L.Z.*, 111 A.3d. 1164, 1176 (Pa. 2015); 42 Pa.C.S. § 6341(a), (c). Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Interest of A.C.*, 237 A.3d 553, 558 (Pa. Super. 2020) (citation omitted). "It is not necessary that the evidence be uncontradicted provided it carries a clear conviction to the mind or carries a clear conviction of its truth." *In Interest of J.M.*, 166 A.3d 408, 423 (Pa. Super. 2017).

## A.

In this case, DHS maintains that the trial court abused its discretion when it found that DHS did not establish child abuse by clear and convincing evidence, thus entitling it to the Section 6381(d) presumption and triggering Parents' burden to rebut it.

Pursuant to Section 6381(d) of the CPSL:

Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S. § 6381(d). That provision triggers a rebuttable presumption that Parents perpetrated the abuse. In interpreting Section 6381(d), our Supreme

Court has stated that "*prima facie* evidence is not the standard that establishes the child has been abused, which must be established by clear and convincing evidence; it is the standard by which the court determines whom the abuser would be in a given case." ***In re L.Z.***, 111 A.3d at 1178 (citation omitted).

The parent or responsible caregiver rebuts this *prima facie* presumption by:

> [d]emonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by ... [DHS] ... and the rebuttal of the parent or responsible person.

***Interest of G.R.***, 282 A.3d 376, 382 (Pa. Super. 2022) (citations omitted); ***see also In re S.L.***, 202 A.3d 723, 728 (Pa. Super. 2019) (Section 6381(d) presumption "can be rebutted, like other statutory presumptions, with countervailing competent, substantial evidence.") (citations omitted).

The trial court found that DHS had not established the "bodily injury" necessary for a finding of child abuse because it did not prove that Child's injuries caused substantial pain where Dr. Miller's testimony about pain was

"equivocal." (**See** Trial Ct. Op., at 15); **see also** 23 Pa.C.S. § 6303(a).[5] We disagree.

The New York Court of Appeals has observed that although "'substantial pain' cannot be defined precisely, [] it can be said that it is more than slight or trivial pain. Pain need not, however, be severe or intense to be substantial." **People v. Chiddick**, 8 N.Y.3d 445, 447 (N.Y.Ct.Ap. 2007). This observation is consistent with criminal cases in this Commonwealth where "bodily injury" under the Crimes Code is defined the same as under the CPSL, *i.e.*, as the "[i]mpairment of physical condition or substantial pain." 18 Pa.C.S. § 2301.

In that context, this Court has observed that "injuries that are trivial in nature" do not satisfy the statutory definition of bodily injury. **Commonwealth v. Wroten**, 257 A.3d 734, 744 (Pa. Super. 2021) (citation omitted). "[T]he existence of substantial pain may be inferred from the circumstances surrounding the use of physical force even in the absence of a significant injury." **Id.** (citation omitted). In fact, Pennsylvania Courts have found "substantial pain" for "bodily injury" purposes where the injuries are far less severe than those at issue here. **See**, **e.g.**, **Commonwealth v. Marti**,

---

[5] We agree with the court that DHS did not prove that Child suffered any "impairment" from the fractures. Dr. Miller was unable to give an opinion on possible impairment of Child's range of motion. (**See** N.T., at 36, 42). He also testified that Child was developmentally "on track," he did not observe any behavior that was abnormal for her age and the fractures did not require any treatment. (N.T., at 28); (**see id.** at 28, 33, 39-40, 48).

- 19 -

779 A.2d 1177, 1181-82 (Pa. Super. 2001) (deliberate punch with a closed fist resulting in "slight swelling and pain" met statutory definition of bodily injury); *In re M.H.*, 758 A.2d 1249, 1252 (Pa. Super. 2000) (individual who aggressively grabbed arm of another and pushed her against wall caused substantial pain for bodily injury, even though victim did not require medical attention and only sustained bruises that lasted a few days.); *Commonwealth v. Richardson*, 636 A.2d 1195, 1196 (Pa. Super. 1994) (punch to the face that broke the victim's glasses and caused pain for several days caused bodily injury as defined by Crimes Code).

Instantly, it is undisputed that seven-month-old Child had fractures to her two arms and one rib, more significant injuries than those detailed above that satisfied the substantial pain required for a "bodily injury". *See Boggavarapu v. Ponist*, 542 A.2d 516, 518 (Pa. 1988) ("We have held and hold now that there are injuries to which human experience teaches there is accompanying pain. Those injuries are obvious in the most ordinary sense: the broken bone … and all the consequences of any injury traceable by medical science and common experience as sources of pain and suffering."). Rather than being equivocal, Dr. Miller testified that although Child was not in pain by the time he examined her because the injuries were healing, he would expect fracturing a bone to be painful to a child. (*See id.* at 34). Although Dr. Miller did not use the precise words "substantial pain," common experience informs us that three broken bones cause more than slight or trivial pain and

suffering and, instead, substantial pain can be inferred from the force used to cause them.

Hence, we find that the trial court abused its discretion when it unreasonably concluded that DHS did not provide clear and convincing evidence that Child experienced the substantial pain necessary for a finding of bodily injury. *See In re Adoption of S.P.*, 47 A.3d at 826.

However, this does not end our inquiry because the trial court found that DHS failed to establish the fractures were child abuse pursuant to 23 Pa.C.S. § 6303(b.1)(1) where it did not prove that Parents caused the injury since there were other possible explanations, *i.e.*, bone fragility syndromes and co-sleeping.

We first address the rare bone fragility syndromes explanation.

**B.**

Dr. Miller testified that Child underwent metabolic and genetic testing[6] to assess her for issues that could predispose her to fractures and the testing did not reveal any abnormal results. (*See* N.T., at 29-30). Furthermore, the bones appeared healthy on the x-rays. (*See id.* at 30). Because of these

---

[6] This included "testing to assess bone health including some electrolytes that are in the blood, things like calcium, magnesium and phosphorus that are part of what constitutes the mineral of the bone as well as a Vitamin D level." (N.T., at 30). "The results of those tests did not indicate anything abnormal that we would expect to predispose to fractures." (*Id.*) Genetic "screening for Osteogenesis Imperfecta or OI, … a predisposition to fractures, … was negative as well[.]" (*Id.*).

- 21 -

results, Dr. Miller concluded that Child's fractures were likely a result of trauma, and because of the absence of accidental trauma history, they were concerning for nonaccidental trauma. (*See* N.T., at 30-32).

However, significant to the court was Dr. Miller's testimony that although testing for OI would identify a "significant majority of genetic variants that could be responsible for OI" and CHOP relies on it, "it is not absolutely 100 percent reliable." (N.T., at 38, 40); (*see* Trial Ct. Op., at 15). The other possible medical causes identified during Dr. Miller's cross-examination included Rickets, Cole Carpenter Syndrome, Bruck Syndrome, familial osteoporosis, and McCune-Albright Syndrome. (*See* N.T., at 41-42). Dr. Miller testified that Rickets, familial osteoporosis and McCune-Albright Syndrome were not clinically indicated. (*See* N.T., at 41-42). He testified that he could not speak to Cole Carpenter Syndrome in detail or how it relates to this case and he was not certain off-hand what the medical evaluation for that would be. (*Id.*). Testing for Bruck Syndrome was not conducted and Dr. Miller testified that "[t]here were no abnormalities on physical exam that would suggest that it would be appropriate to test for McCune-Albright." (N.T., at 42).

The trial court did not accept that the Child was abused because her fractures could have been the product of some speculative rare bone fragility syndromes that Dr. Miller had not found. That was an abuse of discretion because the finding ignores that it was Parents' burden to establish the

- 22 -

alternate cause of injury once DHS made out the *prima facie* case, as well as the fact of it being based on pure speculation. Parents did not provide any evidence that the above rare conditions were relevant to Child's case. They did not identify any family history, physical symptoms or medical tests suggesting that Child might have any of these syndromes. The fact is, since being removed from Parents' care, Child had not suffered any further fractures. While it is not the province of this Court to re-weigh the evidence, we conclude that the trial court's finding that Child did not suffer child abuse because her fractures could have been caused by these rare bone fragility syndromes that are not supported in any way in the record was an abuse of discretion. *See Interest of T.G.*, 208 A.3d at 490; *In re Adoption of S.P.*, 47 A.3d at 826 (Pa. Super. 2019).[7]

We next turn to the court's finding that co-sleeping possibly explained Child's fractures.

---

[7] In *T.G.*, this Court reversed a trial court's order declining to find child abuse. T.G., who had advanced special needs, was diagnosed with malnutrition and joint contractures that her doctor testified were caused by medical neglect. The trial court discredited the treating physician's testimony and instead concluded that the child's preexisting medical conditions might have caused or contributed to the child's symptoms. *See id.* at 492. In reversing, this Court observed that "the certified record is bereft of any evidence that would sustain the court's conclusion that eight-year-old T.G.'s current diagnosis of failure to thrive is the result of preexisting conditions." *Interest of T.G.*, 208 A.3d at 496.

**C.**

At trial, DHS asked Ms. Priest whether Father had an explanation for the injuries and she responded he did not, but he mentioned he had been co-sleeping with Child during naps when he was watching her, "but that was the only explanation he had." (*See* N.T., at 13).[8] In its opinion, the trial court suggested that Child's fractures could have been caused by Father co-sleeping with her during naps because Dr. Miller did not rule this out. (*See* Trial Ct. Op., at 15).

However, our review of the record does not support the court's characterization of the testimony. During Dr. Miller's cross-examination, the following interaction occurred:

> **Q.** If an adult was co-sleeping with a child and both were asleep, could a child of [Child]'s age sustain broken ribs if the adult had slept on top of her?
>
> **A.** That's not something that I've ever heard of a case report being described.
>
> **Q.** How about—

---

[8] DHS argues that there is no evidence that Father co-slept with Child other than the testimony of its witness, Ms. Priest, who testified about Father's disclosures to DHS during the investigation. (*See* DHS's Brief, at 28-29). DHS also cites Pa.R.E. 801 & 802 in support of its argument that Father's statements regarding co-sleeping are hearsay that is not admissible for the truth of the matter asserted. (*See id.* at 29). However, our review of the record confirms that no party objected to the admission of this testimony as hearsay so any hearsay objection is waived. Moreover, it was DHS that elicited this testimony and chose not to question Ms. Priest further about the reliability of the statement.

**THE COURT**: Sir, you didn't answer the question. She asked if it could happen. You said, I've never heard a report about it. That's not—could it happen?

**THE WITNESS**: I can't say that it is without a shadow of any possible doubt, but it's something that I've never heard of.

**THE COURT**: So you couldn't rule it out?

**THE WITNESS**: To the extent that I can't rule out anything with absolute certainty.

**THE COURT**: Okay.

(N.T., at 43). Thereafter, he again stated, "We know what risks are associated with co-sleeping and fractures are not among them." (N.T., at 44).

"While the trial court was not required to accept [a doctor]'s medical opinion, the trial court's countervailing conclusions must be supported independently by the record." *Interest of T.G.*, 208 A.3d at 496. Instantly, Parents did not offer any evidence to support the theory that co-sleeping could have resulted in Child's "highly abnormal pattern" of bi-lateral elbow fractures and a fractured rib and Dr. Miller's testimony made no admissions that supports the court's conclusion. (*Id.* at 32-33). Based on our independent review, we conclude that the trial court' s conclusion that co-sleeping possibly caused Child's injuries is not supported by the record.

For all of the foregoing reasons, the trial court's conclusion that DHS failed to provide clear and convincing evidence to establish child abuse was unreasonable and an abuse of discretion. *See Interest of T.G.*, 208 A.3d at 490, 496; *In re Adoption of S.P.*, 47 A.3d at 826.

**D.**

Because DHS established child abuse by clear and convincing evidence, it triggered the rebuttable presumption that Parents perpetrated the abuse. *See* Pa.C.S. § 6381(d).[9] Therefore, Parents had the burden of rebutting this presumption by producing "countervailing, competent, substantial evidence" that they did not inflict the abuse, potentially with evidence that another individual was responsible for it. *In re S.L.*, 202 A.3d at 728; *see also Interest of G.R.*, 282 A.3d at 382. Any parent who does not testify or present evidence cannot rely on prior statements to caseworkers and treating physicians to rebut the Section 6381 presumption. *See Interest of G.R.*, 282 A.3d at 385.

Parents declined to testify or offer any evidence. Therefore, they failed to rebut the presumption that they were the perpetrators of the child abuse. *See In re S.L.*, 202 A.3d at 728; *Interest of G.R.*, 282 A.3d at 382, 385.

In sum, we conclude that the trial court abused its discretion when it found that DHS did not establish child abuse by clear and convincing evidence and that Parents had no duty to rebut the presumption that they were the perpetrators. *See Interest of T.G.*, 208 A.3d at 490.

---

[9] The purpose of Section 6381(d)'s presumption is "'to avoid the evidentiary conundrum where the existence of abuse is rather easily proven but the court is unable 'to assign responsibility for the heinous act among the responsible adults[,]' and to protect children from future abuse." *Interest of A.C.*, 237 A.3d 553, 559 (Pa. Super. 2020) (citing *In re L.Z.*, 111 A.3d at 1185).

**IV.**

Next, DHS argues that since it established child abuse, the trial court abused its discretion in failing to adjudicate Child dependent.

> A "dependent child" is defined, in relevant part, as one who is "without proper parental care or control, subsistence, education as required by law or other care or control necessary for his physical, mental or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian, or other custodian that places the health, safety or welfare of the child at risk." 42 Pa.C.S. § 6302. "The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available.

*Interest of A.C.*, 237 A.3d at 563 (citation, footnote and brackets omitted). "'Proper parental control' is defined as that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *Id.* at 563 n.10 (citation and some internal quotation marks omitted).

The trial court acknowledges that a finding of child abuse by a parent or caregiver is sufficient to establish dependency and primarily based its dependency decision on its ruling declining to find abuse. (*See* Trial Ct. Op., at 18); *see also Interest of A.C.*, 237 A.3d at 564 (court properly found child dependent where DHS presented sufficient evidence to prove child abuse and mother failed to explain the injuries). Alternatively, it found that even if Parents committed child abuse, dependency is inappropriate because "DHS failed to present evidence that Child **presently** lacks proper parental care and

control and that such care is not immediately available." (Trial Ct. Op., at 18) (emphasis in original).

However, as observed by DHS, "Pennsylvania law makes clear that a finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." *In re E.B.*, 83 A.3d 426, 433 (Pa. Super. 2013) (citation omitted); *see also Matter of DeSavage*, 360 A.2d 237, 241-42 (Pa. Super. 2013) (rejecting argument that child cannot be adjudicated dependent unless he is in custody of parents who are presently shown to be unable to render proper care and control because it "ignores the possibility that if the 'experiment' [of returning child to parent's care] proves unsuccessful, the consequences to the child could be seriously detrimental or even fatal.").

As noted by DHS, dependency is "best suited to the safety, protection and physical, mental, and moral welfare of Child" because it will allow DHS the opportunity to supervise the process of reunifying the family and ensure Child is safe once back in Parents' care. 42 Pa.C.S. § 6351(a). We agree.

Seven-month-old Child suffered three broken bones while in her Parents' care and has not experienced any such injuries while residing with her paternal aunt pursuant to the current DHS plan. Although, since then, Parents have cooperated with DHS and completed a parenting class, this does not alter the fact that they are the presumed perpetrators of the child abuse and there is no evidence to suggest that they have done anything to remedy

the issues that led to this abuse. Under these circumstances where DHS has proven child abuse by clear and convincing evidence, we agree that it would be in Child's best interest to be adjudicated dependent so that DHS can continue to work with them for family reunification.

Therefore, for all the foregoing reasons, we reverse the court's order dismissing the dependency petition and its finding that Parents did not commit child abuse against Child.

Order reversed. Case remanded. Jurisdiction relinquished.

Judge Stabile joins the Opinion.

Judge Bowes files a Concurring Statement.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/13/2023