J-A14033-24 & J-A14034-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN THE INTEREST OF: X.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.C., FATHER | : | No. 2963 EDA 2023 |

Appeal from the Order Entered October 26, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000394-2023

| IN THE INTEREST OF: X.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.G., MOTHER | : | No. 2964 EDA 2023 |

Appeal from the Order Entered October 26, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000394-2023

BEFORE:    LAZARUS, P.J., STABILE, J., and LANE, J.

MEMORANDUM BY LANE, J.:                         **FILED SEPTEMBER 5, 2024**

We address together the appeals of R.C. ("Father") and S.G. ("Mother") (collectively, "the Parents") from the orders finding them to be perpetrators of child abuse against their daughter, X.C. ("the Child"), born in November 2022, and adjudicating her dependent.  We affirm.

We first summarize that in March 2023, the Philadelphia Department of Human Services ("DHS") agency received a Child Protective Services ("CPS") report which: averred the Child, then four months old, had unexplained injuries; and indicated the Parents were perpetrators of child abuse for causing

bodily injury to the Child either by recent acts or a failure to act. Initially, the Child remained in the Parents' home under an in-home safety plan, where two family members "agreed to move in[ and] provide line[-]of sight[-]supervision in the home." N.T. Child Abuse Hearing, 10/26/23, at 222. However, after a follow-up examination showed the Child sustained new injuries, DHS implemented an out-of-home safety plan, placing the Child first with her godmother and then her paternal grandmother. A supplemental CPS report was indicated for child abuse. *See id*. at 231.

DHS filed a dependency petition, which alleged the Child was dependent and/or abused. The trial court conducted an evidentiary hearing on October 26, 2023. DHS presented: Maria Henry, M.D., who testified as a fact witness and expert witness in child abuse pediatrics; Ciara Latimer ("Caseworker Latimer"), the DHS social worker who worked on the family's case; and Shyeera Williams ("Ms. Williams"), the CUA case manager supervisor. Mother, represented by counsel, testified on her own behalf and presented Jack Levenbrown, M.D. ("Dr. Levenbrown"), as an expert in pediatrics, radiology, and pediatric radiology. Father was represented by separate counsel and did not testify or present any evidence. The Child, who was eleven months old at the time of the hearing, was represented by a child advocate. We review the evidence presented in detail.

Mother testified to the following: at a mid-March 2023 pediatrician appointment, there were no concerns with Child's well-being. *See* N.T.,

10/26/23, at 276-77. The next day, however, Mother observed a red line on the Child's forearm and returned to the pediatrician, and the day after that, took the Child to the emergency department of the Children's Hospital of Philadelphia ("CHOP").

At the hospital, a physical examination revealed the Child had two "linear bruises," on her left forearm and right calf. *Id*. at 25. Additionally, a skeletal survey, which was reviewed by two attending pediatric radiologists, revealed Child had two healing rib fractures on her right side.[1]

Dr. Henry, a CHOP attending pediatric physician and member of the hospital's child protection team, testified that she reviewed the reports of the Child's bruising and skeletal surveys, and examined the Child. Dr. Henry met with Mother, who "provided a history of several episodes that were concerning for bruising:" in early February, Mother "noticed a linear mark on" the Child's arm, and "more recently[,] a circular, purple mark on [the C]hild's chest." *Id*. at 43. Mother denied there were any accidental drops, falls, or other events that could have caused the Child's injuries. *See id*. at 44.

Caseworker Latimer also interviewed Mother and Father, who explained they were Child's primary caretakers, but cared for her on "alternate shifts due to work schedules." *Id*. at 217. Neither Parent could explain what caused

---

[1] At the hearing, Dr. Henry explained: "A skeletal survey is imaging of all of a child's bones to help detect fractures that may be difficult to assess on a physical exam." N.T., 10/26/23, at 26.

the Child's injuries. At this time, DHS implemented an in-home safety plan, under which "two family members[,] identified by the family[,] agreed to move[ in and] provide line of sight supervision in the home." *Id*. at 222.

Twenty days later the initial CHOP visit, Mother brought the Child back to CHOP for a follow-up skeletal survey. This survey showed the Child had two additional rib fractures on her left side, as well as a classic metaphyseal fracture ("CML fracture") in her left tibia, or shin bone.[2] *See id*. at 31-32. A cast was placed on the Child's left leg.[3] CHOP staff also conducted genetics testing for possible predispositions for fractures, a bone test for vitamin D deficiencies, and a blood test for a predisposition for bleeding, but the results were normal. *See id*. at 26-27.

At this juncture, we note that following this second skeletal survey, DHS implemented an out-of-home safety plan due to the fact that the Child now had two additional rib fractures and a CML fracture. The Child was removed to her godmother's home, and later to the Child's paternal grandmother's home. *See id*. at 223.

---

[2] We note that at times during the evidentiary hearing, witnesses and the trial court referred to the CML fracture as a fracture to the Child's ankle. *See* N.T., 10/26/23, at 224, 336.

[3] Initially, CHOP staff was also concerned the Child had a CML fracture in her right tibia and placed a cast on her right leg, but subsequently found it was "a normal development variant." *See* N.T., 10/26/23, at 32.

With respect to the possible cause of the injuries, Dr. Henry opined the following. A rib fracture is typically caused by compression of the chest, and a four-month-old infant could not have inflicted this injury on herself. *See* N.T., 10/26/23, at 34, 41, 49. A CML fracture is typically caused by "a twisting or a yanking, or sometimes from an extreme[] flailing, as in shaking." *Id*. at 33. These fractures "have high specificity . . . for abuse, meaning that . . . they are most commonly caused by nonaccidental trauma." *Id*. Both rib fractures and CML fractures are uncommon injuries for a four-month-old infant. *See id*. at 51. Meanwhile, bruises, like the ones the Child had, can be caused by blunt trauma or squeezing, and are "incredibly rare in preambulatory infants." *See id*. at 34, 50. All three types of injuries —a CML fracture, bruising, and particularly a rib fracture — would likely be painful to a four-month-old child. *See id*. at 55-56. Although an infant does not "have a lot of ways to indicate pain, [she] can cry and be fussy." *Id*. at 39. With respect to a rib fracture, "sometimes[,] in particular with astute caregivers, they'll notice . . . paradoxical fussiness, where, in general, [if] you pick up a baby . . . by the chest, you can [cause] irritation of those rib fractures." *Id*.

Finally, Dr. Henry explained that when reviewing for possible child abuse, she considers injuries separately, but also reviews "the overall clinical picture," or "the constellation of injuries." *Id*. at 34. "The plausibility of accidental trauma goes down [when there are] multiple injuries with high specificity for abuse." *Id*. Here, the Child sustained several injuries, at

different times, to "two different organ systems." *Id*. at 35-36. Dr. Henry concluded, within a reasonable degree of medical certainty, that the Child's injuries were not caused accidentally, but instead were "highly concerning for child abuse." *Id*. at 51.

Mother testified to the following. The day after the Child's regular pediatrician appointment, she observed the Child had a red line on her arm. Previously, Mother had observed the same type of mark on the Child's arm following a visit with the Child's godmother, as well as a "dry patch" on the Child's chest. *See id*. at 280. When Mother was informed, at CHOP, that the Child had rib fractures, she was upset and started crying. *Sed id*. at 284. At that time, Mother had not slept for more than twenty-four hours, as she had worked an overnight shift. *See id*. at 284-85. Neither the doctor nor social workers comforted her or "tr[ied] to jog [her] memory" as to how the Child could have sustained the injuries. *Id*. at 286. Afterward, Mother called Father, her mother, the Child's godmother, and "everybody that [the Child has] been around, asking [if] anything ever happened to the [Child] while they watched her." *Id*.

Mother further testified to the following. Two DHS social workers also interviewed her and similarly asked, *inter alia*, about the Child's medical history, whether Mother believed anyone hurt her, and where the Child slept. Subsequently, Mother remembered, and informed Caseworker Latimer by phone, that in February, she tried to carry the Child down the stairs in order

to get a bottle. *See id*. at 203. The family's cat walked between Mother's legs, and Mother fell or slid down the entire flight of steps while she "squeezed [the Child] very tightly." *Id*. at 295. The Child did not touch the ground at any time, but Mother hurt her knee and had rug burns on her back. Afterward, as the Child was crying, Mother got her a bottle, then removed her clothing and inspected her. The Child stopped crying, and Mother believed the Child was not injured, and did not notice any fussiness or issues with the Child's movements. *See id*. at 296-97. Furthermore, Mother explained, the cat previously caused similar issues, and thus the family attached LED strip lights along the banister. *See id*. at 293. Mother also stated that when Caseworker Latimer visited their home, "the cat ran down beside her leg," causing Caseworker Latimer to grab the banister and wall. *Id*. at 297.

Finally, Mother also testified to the following. At the first CHOP visit, a nurse made "a lot" of attempts to insert an intravenous line ("IV") into the Child's leg. *See id*. at 298-99. The nurse "started bending and twisting" the Child's leg while the Child cried. *Id*. at 298. Mother asked "her was that necessary," but the nurse did not stop. *Id*. at 298-99. One nurse then "pinn[ed] down" the Child's arms while a second nurse did "[p]retty much the same thing" before inserting the IV. *Id*. at 299-301. Mother "kept asking them was it necessary, cried, and felt heartbroken. *Id*. at 301. It took "[a] while" to calm down the Child. *Id*. at 302.

Mother presented Dr. Levenbrown, whom the parties stipulated to be an expert in pediatrics, radiology, and pediatric radiology. However, DHS objected to Mother's presentation of Dr. Levenbrown as an expert in pediatric child abuse, and Mother abandoned her attempt to qualify him as such. *See id*. at 142. Dr. Levenbrown was no longer affiliated with any hospital, but "review[ed] cases for . . . attorneys and public defenders." *Id*. at 143. Dr. Levenbrown did not examine the Child nor talk with Mother or the physicians who treated the Child. *See id*. at 187.

Dr. Levenbrown reviewed the Child's pediatrician and CHOP records, her X-rays, the DHS reports, and DHS' dependency petition. He agreed the Child had two healing fractured ribs on her right side, and opined they were "several weeks old," "rib fractures are typically caused by the forceful squeezing of an infant's chest," and here, the Child's right rib fractures were "more consistent with accidental injury." *Id*. at 146, 162-63. Dr. Levenbrown disagreed, however, with CHOP's report that the Child also had two fractured ribs on her left side, and instead believed they were "normal" "widening of the anterior aspect of" the ribs. *Id*. at 167. Dr. Levenbrown cited a 2003 medical journal article, which found that "inflicted rib fractures tend to be multiple, [with a] mean of 5.9 per child." *Id*. at 162. However, Dr. Levenbrown admitted the article concluded that "the identification of any rib fracture in a child younger than three years of age, regardless of location or number, suggests

nonaccidental trauma." *Id*. at 203. Dr. Levenbrown stated that he disagreed with the article's conclusion. *See id*. at 204.

With respect to the Child's left tibia, Dr. Levenbrown stated "[t]here was a tiny fracture, less than one millimeter in width," and it could have been caused, as Mother believed, by the placement of an IV while the Child was "being forcibly held in place." *Id*. at 178-79. In support of this opinion, Dr. Levenbrown cited another medical article, "which discussed a CML occurring at the time of [IV] placement." *Id*. at 179.

Finally, Dr. Levenbrown testified that the Child's right rib fractures and CML fracture would have been asymptomatic, meaning the Child would not have had any symptoms, "react[ed] as being fussy or in pain," nor had any tenderness or swelling. *Id*. at 180-81. Dr. Levenbrown further opined that rib fractures in infants "tend to be totally without symptoms," as an infant's ribs are "surrounded by a lot of muscle tissue, [which] tends to splint the fractures," similar to a cast on a broken bone. *Id*. at 183. Dr. Levenbrown also noted there was nothing in the record that indicated the Child showed symptoms. *See id*. at 182.

Dr. Henry testified that she disagreed with Dr. Levenbrown's conclusions. She opined that the incident Mother recalled, in which she fell down the steps while tightly holding the Child — did not explain the CML fracture to the Child's tibia nor the multiple episodes of bruising. Dr. Henry also rejected the theory that the Child's CML fracture occurred during the

insertion of the IV. Dr. Henry testified that CHOP staff "put in IVs in infants all the time," and that an iatrogenic injury — "meaning an injury caused by the medical care" — was "very rare." *Id*. at 47. Dr. Henry also stated that the article, which Dr. Levenbrown cited, addressed an "isolated injury," where the child had a foot deformity "that the author . . . acknowledged could have impacted [the] propensity to fracture," and the caregivers "described . . . a very clear event, where [they] heard a pop of the foot and [subsequently observed] soft tissue swelling." *Id*. at 48. Dr. Henry pointed out that in this matter, the Child not only had a CML fracture, but also multiple injuries, including rib fractures and bruising. *See id*. at 47.

At the conclusion of the evidence, the trial court concluded the Parents were perpetrators of child abuse and adjudicated the Child dependent. Specifically, the trial court found that only the Child's two right rib fractures — which both expert witnesses agree existed — met the definition of "bodily injury" under the CPSL.[4] *Id*. at 335. The trial court further found these rib fractures would have caused substantial pain, were not ordinarily sustained by a four-month-old child in the course of ordinary care, and were without plausible explanation. *See id*. at 335-38. The trial court relied upon the testimony of Dr. Henry, whom it found credible. *See id*. at 337. In contrast,

_____

[4] The trial court specifically found the Child's bruises and CML fracture of her tibia did not meet the definition of bodily injury under the CPSL. *See* N.T., 10/26/23, at 336.

the trial court found Dr. Levenbrown "not persuasive in his testimony in any degree whatsoever." *Id*. The court thus amended the CPS report of abuse from "indicated" to "founded." *See id*. at 338. Further, the trial court fully committed Child to DHS' custody and removed her from the home. *See id*. at 342.

The Parents each filed a notice of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

We consider Father's appeal first. He presents the following issues for our review:

1. Whether the trial court erred or abused discretion when finding child abuse against the [P]arents under an attenuated standard?

2. Whether the trial court erred or abused discretion when finding child abuse against [F]ather?

Father's Brief at 5.[5]

First, Father avers DHS failed to prove child abuse by clear and convincing evidence. We consider the standard of review and relevant law:

> We review this appeal for an abuse of discretion. The standard of review in dependency cases 'requires an appellate

---

[5] In the argument section of his brief, Father raises an additional issue — that the trial court erred in not qualifying Dr. Levenbrown as an expert in child abuse. However, he did not raise this claim at any time before the trial court, nor include it in his Rule 1925(b) statement. Thus, he has waived this issue for our review. *See* Pa.R.A.P. 302(a) (providing that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal"); *see also In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) (stating that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived).

- 11 -

court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law.

[Although] dependency proceedings are governed by the Juvenile Act (["the Act"[6]]), . . . the [Child Protective Services Law ("CPSL")[7]] . . . controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence. The CPSL does not provide for legal determinations of abuse; it is mainly a vehicle for reporting abuse and bringing quickly into play those services (including court hearings) available through county protective service facilities for the care of the child. [T]he Act and the [CPSL] must be applied together in the resolution of child abuse complaints under the [CPSL and] reference must be made to the definition sections of both the [Act] and the [CPSL] to determine how that finding [of child abuse] is interrelated."

As part of [a] dependency adjudication, a court may find a parent [or caregiver] to be the perpetrator of child abuse[] as defined by the . . . CPSL. . . .

***Interest of G.R.***, 282 A.3d 376, 380-81 (Pa. Super. 2022) (footnotes added, citations and quotation marks omitted).

Section 6303(b.1) of the CPSL, in turn, defines "child abuse" in relevant part to mean: "intentionally, knowingly or recklessly doing any of the following: . . . causing bodily injury to a child through any recent act or failure to act." 23 Pa.C.S.A. § 6303(b.1)(1) (unnecessary capitalization omitted). For purposes of the CPSL, the terms "intentionally," "knowingly," and

---

[6] ***See*** 42 Pa.C.S.A. §§ 6301-6375.

[7] ***See*** 23 Pa.C.S.A. §§ 6301-6388.

"recklessly" have the same meaning as set forth in the Crimes Code.[8]  ***See*** 23

Pa.C.S.A. § 6303(a).  The CPSL defines "bodily injury" as the "[i]mpairment

of physical condition or substantial pain."  ***Id***.

This Court has explained:

> [Section 6381(d) of the CPSL] "provides for an 'attenuated' standard of evidence in making a legal determination as to the abuser in child abuse cases [where] a child has suffered serious physical injury . . . as would ordinarily not be sustained or exist except by reason of the ***acts or omissions*** of the parent or other person responsible for the welfare of the child."  23 Pa.C.S.A. § 6381(d) (emphasis added).

> * * * *

> The requisite standard of proof for a finding of child abuse pursuant to [s]ection 6303(b.1) of the CPSL is clear and convincing evidence.  . . .  Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." []  However, in certain situations, the identity of the abuser need only be established through *prima facie* evidence.  As an appellate court, we are required to accept the findings of fact and credibility determinations of the trial court, if they are supported by the record; however, th[is] [C]ourt is not bound by the [trial] court's inferences or conclusions of law.

---

[8] ***See*** 18 Pa.C.S.A. §§ 101-9546.  Under the Crimes Code, a person acts "intentionally" if "it is his conscious object to engage in conduct of [a certain] nature or to cause [a certain] result."  18 Pa.C.S.A. § 302(b)(1)(i).  A person acts "knowingly" when he is aware that his conduct is of a certain nature or "he is aware that it is practically certain that his conduct will cause . . . a result."  18 Pa.C.S.A. § 302(b)(2)(i)-(ii).  "A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct."  18 Pa.C.S.A. § 302(b)(3).

Section 6381(d) of the CPSL establishes a rebuttable, evidentiary presumption when a child sustains abuse not ordinarily suffered absent acts or omissions of a parent or other responsible party.[9]  Under such circumstances, "the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible."

Under section 6381(d), a parent or other responsible caregiver may rebut the *prima facie* presumption with evidence:

> [d]emonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the prima facie evidence presented by . . . [DHS] . . . and the rebuttal of the parent or responsible person.

*Interest of G.R.*, 282 A.3d at 381-82 (footnote added, some citations omitted).

_____

[9] Section 6381(d) provides:

> **(d) *Prima facie evidence of abuse*.**—Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.A. § 6381(d).  *Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." *Interest of L.Z.*, 111 A.3d 1164, 1185 (Pa. 2014) (citation omitted).

In his first issue, Father avers DHS did not prove child abuse by clear and convincing evidence. He reasons that although "DHS' claim of child abuse [was] based upon Dr. Henry's theory of 'constellation of injuries,'" the trial court made a finding of child abuse based only on the first set of fractured ribs, on the Child's right side, and "dismissed [the additional] injuries discovered later based on the second set of x-rays." Father's Brief at 13-14. Father further asserts the trial court improperly applied the presumption, under section 6381(d) of the CPSL, that he perpetrated child abuse. In support, Father reasons: (1) "Mother took sole responsibility for the injury to [the] Child;" and thus (2) "a finding of abuse against her require[d] the more stringent proof that she caused substantial pain to [the] Child in reckless circumstances." *Id*. at 16. Father further relies on Dr. Levenbrown's opinion that the Child's rib fractures could have resulted from Mother's falling on the stairs.

We reiterate that the trial court found only the Child's two right rib fractures — which both expert witnesses agree existed — met the definition of "bodily injury" under section 6303(a) of the CPSL. N.T., 10/26/23, at 335. The trial court credited Dr. Henry's testimony that a rib fracture would cause substantial pain. *See id*. at 336. On the other hand, the trial court found "Dr. Levenbrown was not persuasive in his testimony in any degree whatsoever. . . . He is not a practicing physician. He serves as an expert

witness in cases.  He contradicted himself.  He relied on an article where . . .

he doesn't believe [its] conclusion." ***Id***.  at 337.

The trial court then found the Child suffered child abuse, as that term is

defined under section 6303(b.1)(1), as follows:

> The trial court heard credible[,] clear[,] and convincing evidence
> from expert witness Dr. Henry to find that the rib fractures
> sustained by the Child meet the statutory definition of bodily
> injury.  Furthermore, the court noted Mother's explanation of the
> bodily injuries is not a plausible explanation for the rib fractures
> which would have caused substantial pain to Child.  Additionally,
> Father did not testify, nor did he provide any explanation for the
> injuries sustained by [the Child].

Trial Court Opinion, 12/22/23, at 1-2 (unnumbered) (*citing*, *inter alia*, N.T.,

10/26/23, at 335-37).

The trial court determined "the burden-shifting analysis under [section]

6381(d) applies in this case."  N.T., 10/26/23, at 338.  In this regard, the trial

court found, as noted above, that both Parents failed to provide a plausible

explanation for the Child's rib fractures. ***Id***. at 337.  The trial court reasoned:

> I am not suggesting that [the P]arents intentionally caused these
> injuries, but I don't need to reach that conclusion, as a four-
> month-old child, I find, would not ordinarily sustain a rib fracture,
> as the [C]hild is nonmobile and unable to exert [herself] in such a
> fashion . . . that would result in a rib fracture, and we don't have
> any plausible explanation.
>
> [Mother] testified honestly on the stand that she has no idea
> how [the C]hild was injured.  She doesn't have a plausible
> explanation that the [c]ourt can find for this injury.  Father didn't
> testify at all, and certainly provided no explanation.

***Id***. at 338.

- 16 -

Our review reveals the trial court's analysis is supported by the record. *See Interest of G.R.*, 282 A.3d at 380. We reiterate that we accept the trial court's findings of fact and credibility determinations if they are supported by the record. *See id*. Father's arguments would require this Court to reweigh the testimonial evidence in his favor, and supplant the trial court's credibility findings with our own. This we cannot do. Accordingly, we determine Father's claim does not merit relief.

Next, Father argues that DHS did not prove the Child, in fact, suffered substantial pain. In support, he reasons that: (1) DHS' examination of Dr. Henry, "pertaining to whether [the] Child experienced substantial pain[,] did not survive Mother's objection for relevance;" and thus (2) Dr. Henry's responses were not a part of the evidentiary record. Father's Brief at 17.

We conclude Father misconstrues the record. At the hearing, DHS asked Dr. Henry whether rib fractures, CML fractures, and bruising were likely to be painful for a four-month-old child. *See* N.T., 10/26/23, at 37-38. Mother's counsel objected on the ground Dr. Henry was not qualified to answer as "she hasn't testified that she has specialized knowledge in assessing whether nonverbal individuals . . . have experienced pain" in the past. *Id*. at 38. The trial court did not explicitly rule on the objection, but directed DHS to rephrase its question. *See id*. at 38-39. DHS thus asked Dr. Henry whether she has ever treated other patients with rib fractures — Dr. Henry responded in the affirmative — and asked, "What are indicators of pain?" *Id*. at 39. Dr. Henry

explained that infants do not "have a lot of ways to indicate pain," but "they can cry and be fussy," and with a rib fracture, can show paradoxical fussiness, where they show fussiness when a caregiver picks them up and irritates the rib fractures. *Id*. at 39. DHS then asked Dr. Henry whether it would be painful for *an adult* to sustain a similar injury. *See id*. at 40. At this time, Mother raised an objection on relevancy grounds, which the trial court sustained. *See id*. at 40-41.

Father wholly fails to examine the above exchange. The premise of his argument — that the trial court sustained relevancy objections to DHS' questions "pertaining to *whether [the] Child experienced substantial pain*" — is mistaken. Father's Brief at 17 (emphasis added). First, the trial court directed DHS to rephrase its questions as to whether a four-month-old child would experience pain with a rib injury, and DHS did so. *See* N.T., 10/26/23, at 38-39. Dr. Henry responded, without objection, that infants can show pain by rib fractures with paradoxical fussiness. *See id*. at 39. The subsequent objection, which the trial court sustained, concerned DHS' question as to whether *an adult* would have pain with a rib injury. *See id*. at 40-41. Accordingly, no relief is due on Father's claim that the trial court sustained objections in a manner that precluded Dr. Henry's testimony as to whether the Child would have suffered substantial pain.

Notwithstanding his above evidentiary argument, Father also asserts that Dr. Henry's opinion was contrary to Dr. Levenbrown's testimony, that rib

- 18 -

injuries were asymptomatic. We conclude no relief is due, as we again emphasize the trial court was free to determine the witnesses' credibility and weigh the evidence. We accept the trial court's findings of fact and credibility determinations if they are supported by the record. **See Interest of G.R.**, 282 A.3d at 380; **see also** Father's Brief at 17.

Father's final argument is that "DHS did not prove that [he] was present at the time of the accident, namely Mother's slip on the stairway." Father's Brief at 18. He adds that he "had no reason to expect that Mother would slip on the stairway steps." **Id**.

We conclude no relief is due, as DHS was not required to prove that Father was present when Mother fell, nor that he had reason to expect Mother would fall. Instead, as we have held above, the trial court properly found: the Child suffered a bodily injury; the section 6381(d) presumption of abuse by the Parents applied; and here, the Parents failed to rebut the presumption with evidence that they did not inflict the abuse. **See** 23 Pa.C.S.A. § 6381(d); **Interest of G.R.**, 282 A.3d at 381-82. For the foregoing reasons, we affirm the orders as they pertain to Father.

Next, we consider Mother's appeal. First, she asserts the evidence was insufficient to support a finding she was a perpetrator of child abuse, as the evidence did not establish the rib fractures caused the Child substantial pain or impairment of her physical condition. In support, Mother maintains that Dr. Henry testified only that she **expected** a rib fracture to cause pain in a

four-month-old child, but when she examined the Child, the Child was alert and had no acute distress or symptoms of pain. *See* Mother's Brief at 25-26. Mother additionally claims there was insufficient evidence that she acted with the requisite *mens rea* to commit child abuse, as "DHS did not assert that [she] intentionally knowingly, or recklessly caused the injury to" the Child. *Id*. at 28.

Based on our review, we conclude the trial court did not abuse its discretion in finding the Child suffered substantial pain, and thus bodily injury. We reject Mother's insistence that Dr. Henry did not testify specifically that the Child, in fact, felt substantial pain. *See* Mother's Brief at 25-26. In *Interest of S.A.S.*, 305 A.3d 1039 (Pa. Super. 2023), a seven-month-old child suffered "multiple fractures and bruising on her wrist, ribs, and elbows that were determined to be non-accidental." *Id*. at 1044. A doctor, who was presented as an expert in child abuse medicine, "testified that although [the c]hild was not in pain by the time he examined her because the injuries were healing, he would expect fracturing a bone to be painful to a child." *Id*. at 1052. This Court held that although the doctor "did not use the precise words 'substantial pain[' in describing the child's injuries,] common experience informs us that three broken bones cause more than slight or trivial pain and suffering and, instead, substantial pain can be inferred from the force used to cause them." *Id*.; *see also Interest of L.Z.*, 111 A.3d at 1175 (holding that

doctor's testimony, that bruising "couldn't have been comfortable," "conveyed, albeit in a flippant manner, that the injuries caused severe pain").

Akin to **S.A.S.**, here, Dr. Henry clearly testified several times throughout the hearing that rib injuries are likely to be painful, and specifically likely to be painful for a four-month-old child. **See** N.T., 10/26/23, at 37-38, 55, 113. She explained that by the time she examined the Child, her rib injuries were healing and thus she "would not expect [them] to be tender to the touch." **Id**. at 41. The trial court was well within its discretion to credit Dr. Henry's testimony and to not credit Dr. Levenbrown, and we do not disturb those findings.

Next, Mother contends the trial court erred in applying section 6381(d), where Dr. Henry did not rule out the possibility that the Child's injuries were accidental. Mother further reasons that "Dr. Henry's failure to consider Mother's explanation usurped the [trial c]ourt's role as fact-finder." Mother's Brief at 33. Mother also avers that Dr. Henry admitted she was not qualified to interpret x-rays, and instead relied upon the opinions of two radiologists. **See id**. at 35.

Based on our review, we discern no abuse of discretion by the trial court. Dr. Henry explained she did consider Mother's explanation that she fell or slid down the steps while tightly holding the Child, after Caseworker Latimer provided her with this information. **See** N.T., 10/26/23, at 45. To the extent, however, that Dr. Henry opined this incident did not explain the cause of the

Child's other injuries — bruising and the CML fracture — such testimony was for the trial court to weigh, along with Dr. Levenbrown's opinion that the fall could have caused the rib fractures. While the trial court did not find that all of the Child's injuries met the statutory definition of bodily injury, Dr. Henry explained that when reviewing for child abuse, she considered "the overall clinical picture," or "the constellation of injuries." *Id*. at 34. Again, this testimony was for the trial court to weigh. *See Interest of G.R.*, 282 A.3d at 380.

Finally, we determine no relief is due on Mother's contention that Dr. Henry was not qualified to independently interpret x-rays. "In Pennsylvania, a medical expert is allowed to express an opinion that is based, in part, on medical records that have not been admitted into evidence if those records are customarily relied upon by experts in his profession." *Cacurak v. St. Francis Medical Center*, 823 A.2d 159, 171 (Pa. Super. 2003). Here, Dr. Henry testified that it was "common practice in [her] field to rely on the consultations and opinions of other physicians in forming [her] opinions." N.T., 10/26/23, at 20. In any event, Mother has not shown she has suffered prejudice, as: (1) her own expert witness, Dr. Levenbrown, agreed that the Child suffered two rib fractures on her right side; and (2) the trial court found the CML fracture, as well as the two rib fractures on the Child's left side, did not meet the CPSL's definition of bodily injury. *See id*. at 156.

Next, Mother avers that even if the section 6381(d) presumption that she was the perpetrator of child abuse applied, she rebutted it. Mother reiterates that she fell down the stairs while tightly holding the Child. Mother then contends the trial court erred in assuming the Child "would have shown some visible manifestation of her rib fractures immediately," as there was no such testimony by other expert witness. Mother's Brief at 40.

Based on our review, we conclude the trial court did not abuse its discretion in finding both Mother and Father did not rebut the presumption that she was a perpetrator of child abuse. It was undisputed they were the Child's primary caretakers during the relevant time period. *See L.Z.*, 111 A.3d at 1180. Mother disclosed the stairs incident to Caseworker Latimer *after* her interviews with both Dr. Henry and Caseworker Latimer. Dr. Henry acknowledged that if Mother "fell in such a way where there was compression of the chest," it was "possible" that incident caused the injury, but she ultimately opined it was not likely, "considering the [Child's] numerous injuries." N.T., 10/26/23, at 109. Nonetheless, Dr. Henry emphasized that she "fully" considered Mother's explanation, but would have expected such an incident to have been reported sooner.

In any event, Mother testified that she examined Child after the fall and believed she "was fine." *Id*. at 296. The trial court credited this testimony, finding that because a rib fracture would have caused substantial pain, the fall "was not an explanation for the [Child's] rib fractures. *Id*. at 337. This finding

supports the trial court's conclusion that the Parents did not provide a plausible explanation that the Child's injuries were accidental.

Mother's last argument on appeal is that the record did not establish a clear necessity to remove the Child from the home. She contends that "DHS failed to make reasonable efforts to keep [the Child] in her home by failing to meet with the family to design an appropriate in-home safety plan, despite believing it to be appropriate and recommending in-home supervision to the court." Mother's Brief at 45. Mother contends that even if it were not appropriate for Child to reside in the home with Parents, the court erred in ordering removal as opposed to maintaining the out-of-home safety plan. *See id.* at 45. Mother notes that "the trial court did not order the [P]arents to do anything more than continue with visitation, and it directed the parties to hold a meeting to decide 'what, if any, appropriate case plan objectives need to be set,' and suggested reunification would be appropriate at the next court date, without providing any reason why separation was necessary at all." *Id*. at 44-45 (emphases omitted).

Upon finding a child dependent, the trial court must "make a proper disposition of the case" and enter an order that is "best suited to the safety, protection and physical, mental, and moral welfare of the child." 42 Pa.C.S.A. §§ 6341(c), 6351(a). If the court determines that removal of the dependent child from his home is appropriate, the court shall make findings, *inter alia*: (1) "that continuation of the child in his home would be contrary to the welfare,

safety or health of the child;" and (2) whether reasonable efforts were made to eliminate the need for the child's removal. 42 Pa.C.S.A. § 6351(b)(1), (2). This Court has explained:

> The law is clear that a child should be removed from her parent's custody and placed in the custody of a state agency only upon a showing that removal is clearly necessary for the child's well-being. In addition, [a] clear necessity for removal is not shown until the hearing court determines that alternative services that would enable the child to remain with her family are unfeasible.
>
> In addition, this Court has stated: "[I]t is not for this [C]ourt, but for the trial court as fact finder, to determine whether [a child's] removal from her family was clearly necessary."

*In re A.B.*, 63 A.3d 345, 349-50 (Pa. Super. 2013) (citations omitted).

Here, the record supports the trial court's finding that there was a clear necessity for removal, and we discern no abuse of discretion. Mother ignores Caseworker Latimer's testimony that following the Child's first CHOP visit, DHS initially implemented an in-home safety plan, under which two family members moved into the family's home and agreed to provide "line of sight supervision in the home." N.T., 10/26/23, at 222. Subsequently, a second skeletal survey showed two additional rib fractures and a CML fracture to the Child's tibia; based on these new injuries, DHS changed the safety plan to be out-of-home. *See id*. at 223-24. Thus, in light of the multiple incidents of unexplained injuries, even with an in-home safety plan, concerns remained for the Child's safety and welfare. At the hearing, Ms. Williams, the CUA case manager supervisor, recommended continued supervision findings are

supported by the record, and thus we do not disturb them. ***See Interest of***

***G.R.***, 282 A.3d at 380. Based on the foregoing, we determine no relief is due

on Mother's issues.

We affirm the trial court's orders adjudicating the Child to be dependent

and finding both Parents to be perpetrators of abuse.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/05/2024